Miguel A. MARTINEZ–JORDAN,
et al., Plaintiffs,

v.

BAXTER HEALTHCARE CORP.,
et al., Defendants.

Civil No. 07–2072 (ADC).

United States District Court,
D. Puerto Rico.

Feb. 18, 2009.

Dennis A. Simonpietri–Monefeld, Dennis A. Simonpietri Law Office, Santa Paula Guaynabo, PR, for Plaintiffs.

Diana M. Espinosa–Nunez, Juan J. Casillas–Ayala, Fiddler, Gonzalez & Rodriguez, Reggie Diaz–Hernandez, San Juan, PR, for Defendants.

## OPINION AND ORDER

AIDA M. DELGADO–COLÓN, District Judge.

Plaintiffs, Miguel Martínez–Jordán ("Martínez" or "plaintiff"), his wife, Carmen D. Díaz–Miranda, and their Conjugal Partnership (collectively, "plaintiffs"), brought suit pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("*ADEA*"), Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("*ADA*"), Puerto Rico's Law No. 100 of June 30, 1959, *as amended*, 29 L.P.R.A. § 146 et seq., Law No. 44 of July 2, 1985, 1 L.P.R.A. § 501 et seq., Law No. 80 of May 30, 1976, *as amended*, 29 L.P.R.A. § 185a et seq., against Baxter Healthcare Corp. ("Baxter"), Nydia Márquez ("Márquez") and Pablo Vélez ("Vélez").[1] **Docket No. 1**, at Ex. II.[2]

Now before the court is defendants' motion for summary judgment and statement of uncontested material facts. **Docket Nos. 59, 60, 61.** Plaintiffs' opposition and opposing statement of facts were struck from the record, so defendants' motion will be considered unopposed.[3] At issue is

---

1. Plaintiffs filed their complaint in the Court of First Instance of Puerto Rico, Superior Part of Caguas, on October 2, 2007. **Docket No. 1**, at Ex. II. Defendants removed the case to this court on November 8, 2007. **Docket No. 1.**

2. The claims brought against Márquez and Vélez were dismissed with prejudice on January 29, 2009. **Docket No. 114.**

3. On January 30, 2009, the court, prompted by plaintiff's miscompliance with numerous filings deadlines decided to strike plaintiffs' opposition to defendants' motion for summary judgment. **Docket No. 115.** *Id.* at 2 n. 1. Although defendants' motion is now unopposed, the court must still "consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." *Mullen v. St. Paul Fire and Marine Ins. Co.,*

whether plaintiffs' allegations support causes of action for age and disability discrimination. For the reasons set forth below, the court finds that they do not, and, therefore, **GRANTS** defendants' motion.

## I. Factual and Procedural Background

Unless otherwise noted, the following relevant facts are derived from defendants' statement of facts and the record. Consistent with the summary judgment standard, the court states the facts in the light most favorable to plaintiffs, the nonmoving party. *See Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir.2006). However, inasmuch as defendants' motion and statement of facts are unopposed, the court deems admitted all properly supported facts contained in defendants' statement of uncontested material facts. *See* L. Cv. R. 56(e).

### A. Background of Baxter

Baxter is a subsidiary of Baxter International Inc. ("Baxter International"). **Docket No. 59,** at ¶ 1. One of Baxter's manufacturing facilities is in Guayama, Puerto Rico (the "facility"). *Id.* The facility is the only chemical plant operated by Baxter in Puerto Rico. *Id.* The facility manufactures inhalation anesthesia. *Id.* at ¶ 2. The main products produced are Isoflurane (Forane), Desflurane (Suprane) and Sevoflurane. *Id.* The facility is currently the sole provider for the worldwide anesthesia market of Desflurane (Suprane). *Id.* The manufacturing activities at the facility are supported by a group of strategically aligned functions including: quality, environmental health and safety compliance, materials planning, mainte-

nance, engineering, human resources and finance. *Id.* at ¶ 3.

Pharmaceutical companies such as Baxter are strictly regulated by state and federal agencies such as the Food and Drug Administration, Environmental Protection Agency, Environmental Quality Board, Occupational Safety and Health Administration ("OSHA"), Puerto Rico's Occupational Safety and Health Office and Toxic Substances Control Act. *Id.* at ¶ 4.[4] The facility is certified by various independent organizations, including, but not limited to, the International Organization for Standardization 14001 ("ISO 14001 Certification"). *Id.* at ¶ 6. The ISO 14001 Certification is highly valued by Baxter because it allows it to market the goods manufactured in its facility throughout the world (and specifically in Europe). *Id.*

### B. Background of Plaintiff

Plaintiff was born in 1945 in Caguas, Puerto Rico, graduated from Notre Dame High School in 1963 and obtained his Bachelor's Degree in General Sciences from the University of Puerto Rico in 1967. *Id.* at ¶ 7; **Docket No. 70,** Ex. 2 at 19. In 2002, plaintiff received a Masters in Business Administration Degree with a concentration in Human Resources from Turabo University. **Docket No. 59,** at ¶ 8. Baxter financed said degree. *Id.* While working at Baxter, plaintiff took an average of six to ten seminars per year related to his practice areas. *Id.* at ¶ 9. According to plaintiff, he applied for the position of Security Manager at OHMEDA (Baxter's predecessor company) in 1994 through a headhunter named Janet C. Palacios. *Id.* at ¶ 10. Justo Malavé ("Malavé"), Human

---

972 F.2d 446, 452 (1st Cir.1992) (internal citation and quotations omitted).

4. Chemical plants, such as the Baxter facility, deal with many chemicals, including, but not limited to, lethal chemicals, high tempera-

tures, high pressures and the probabilities of explosion or fire are higher than in any other industry. **Docket No. 59,** at ¶ 5. Accordingly, it was very important for Baxter to be careful with its safety program. *Id.*

Resources Director at OHMEDA, interviewed plaintiff for the position of Manager of Employee Safety and extended an offer of employment to him. *Id.* at ¶ 11. One of Baxter's goals was to lower the number of employee related accidents, and that was one of the tasks expected from plaintiff. *Id.* at ¶ 12. Plaintiff began to work at OHMEDA on July 11, 1994, as Employee Safety Manager with a starting salary of $60,000.00. *Id.* at ¶ 13. Plaintiff's supervisor at the time was Malavé. *Id.*

As Manager of Employee Safety, plaintiff was in charge of the facilities security program, which included: providing employee orientations and trainings, updating trainings, performing inspections of the plant, buying personal safety equipment, implementing OSHA standards, taking the necessary measures to prevent accidents, and revising and updating the Standard Operating Procedures ("SOPs"). *Id.* at ¶ 14. Plaintiff described his relationship with Malavé as "sour." *Id.* at ¶ 15. He contends that his problems with Malavé were caused by Malavé's authoritative management style. *Id.* Plaintiff conceded that Malavé behaved and applied the same management style to other employees. *Id.*

After plaintiff began working at OHMEDA, the company experienced an increase in work related accidents. *Id.* at ¶ 16. On November 15, 1995, plaintiff was demoted from Employee Safety Manager to Training Coordinator/Facilitator. *Id.* at ¶ 17.[5] As a result of the demotion, plaintiff's salary was reduced by roughly $7,500 annually. *Id.* Plaintiff believes that these actions were discriminatory in nature. **Docket**

No. 70, Ex. 2 at 81. After being demoted, plaintiff was replaced on an interim basis by Raúl Rosa ("Rosa") who at the time was one of Baxter's internal engineers. **Docket No. 59,** at ¶ 18. In 1998, Rosa was replaced by Ramón Torres–Príncipe ("Torres"). *Id.* As Training Coordinator/Facilitator, plaintiff was responsible for, among other things, establishing the training unit expansion, updating training policy, managing the "TRIM" Program, supporting the Ergonomics Program and the Safety and Health Program, as well as being in charge of organizing the loss control programs and trainings. *Id.* at ¶ 19. Torres was set to leave Baxter on February 13, 1998. *Id.* at ¶ 20. Malavé appointed plaintiff as interim Safety and Emergency Manager. *Id.*

### 1. Baxter's acquisition of OHMEDA

In 1998, Baxter acquired OHMEDA. *Id.* at ¶ 21. As such, on March 18, 1998, plaintiff signed an employment agreement with Baxter. *Id.* Further, in a document signed on January 17, 2003, plaintiff admitted having received Baxter's employee handbook, as well as all its rules and policies. *Id.* at ¶ 22. Upon Baxter's acquisition of OHMEDA, a transition process began whereby OHMEDA's prior procedures and classifications were integrated into Baxter's policies and business culture. *Id.* at ¶ 23. One of the multiple areas that were adapted was human resources, specifically, job classification and compensation. *Id.* Baxter implemented a classification/compensation software called "People soft," under which Baxter did not have a "Manager, Employee Safety" position, the

---

**5.** On December 14, 1994, Malavé graded plaintiff's performance giving him a negative overall rating. *Id.* at ¶ 150. In said evaluation, Malavé noted that "[plaintiff] was not able to prepare and implement trainings to comply with compliance training schedules. This was a critical area on [plaintiff's] recruitment process and I expect to see results soon." *Id.* In said evaluation, Malavé also stated that "[i]t has been a great concern the fact that accident frequency has increased after [plaintiff] joined our plant. [Plaintiff] needs to take a more direct involvement in determining the causes of such accidents and apply more effective techniques to change the tendency." *Id.*

one held on an interim basis by plaintiff. *Id.* at ¶ 24. This was not the only position, however, that was affected. Several other employees' positions did not have an equivalent in Baxter. *Id.* at ¶ 25. Accordingly, Baxter tried to place the employees on a classification similar or analogous to the one previously held by the employee at OHMEDA. *Id.* One of those employees was plaintiff. *Id.* On September 1, 1998, plaintiff was classified as an Environmental/Safety Associate in the Environmental, Health and Safety ("EHS") Department. *Id.* at ¶ 27. Plaintiff's supervisor was the EHS Director, Pablo Vélez ("Vélez"). *Id.* at ¶ 28.

## 2. Environmental Health and Safety at Baxter

Baxter's EHS Department is responsible for minimizing health and safety risks to employees and the general public, encourage appropriate environment, health and safety practices, monitor compliance with federal, state and local environment, health and safety regulations and to minimize the company's liability. *Id.* at ¶ 29. Plaintiff was responsible for identifying existing and potential hazards in the facility, determine causes and develop solutions, prepare a response system and implement it successfully. *Id.* at ¶ 30. He was also in charge of assessing and organizing the safety and emergency response training, manage comprehensive training programs in order to comply with company and regulatory agencies' requirements, investigate all safety, environmental and loss control related incidents as well as find causes and implement actions to avoid reoccurrences. *Id.* Plaintiff was also the chairman of the Plant Safety and Environmental Team ("PSET"). *Id.* at ¶ 32. Plaintiff stated that the PSET was a safety committee that had monthly meetings to discuss the monthly developments of the facility's environmental, health and safety programs. *Id.*; *see also* **Docket No. 70**, Ex. 2, at 150. The PSET was one of the main mechanisms employed by Baxter's management to guarantee compliance with EHS requirements and corporate policy. **Docket No. 59**, at ¶ 33.

## 3. Environmental, Health and Safety Audits

Baxter International, Baxter's holding company, performs an environmental, health and safety corporate audit ("EHS Corporate Audit") in all its branches and subsidiaries, including the facility. *Id.* at ¶ 34. The EHS Corporate Audit helps the company manage EHS risks and ensures that EHS programs are working effectively. *Id.* The EHS Corporate Audit program is staffed by members of the corporate EHS audit group, other Baxter International EHS professionals, external EHS auditors from ERM Certification and Verification Services, and local regulatory experts, if necessary. *Id.* The EHS Corporate Audit objectives are to review the facilities': (1) compliance status with applicable EHS laws; (2) conformance with EHS policies and procedures; (3) implementation of EHS management control systems; (4) assessment of EHS risk; and (5) assess the conformance of the environmental management system with the requirements of the ISO 14001 standard. *Id.* at ¶ 35.

The Baxter International EHS program follows a management-systems approach guided by its global EHS requirements. *Id.* at ¶ 36. The program has evolved from using only internal standards to also applying externally recognized standards in order to develop EHS program objectives. *Id.* When an EHS Corporate Audit is performed, the facility receives a EHS audit group and an external auditor from ERM. *Id.* at ¶ 37. The audit entails several days of hands-on inspections led by experts in the EHS field. *Id.* at ¶ 38. During an audit, the audit team assesses compliance with important regulatory

measures and Baxter requirements while discussing the different features of the facilities operations. *Id.* The auditors also conduct a detailed inspection of the entire facility, perform random interviews with employees and review selected documents. *Id.* The audits last for around three (3) to four (4) days. *Id.*; *see also* **Docket No. 64,** Ex. 11, at ¶ 7. The Corporate Audit's are typically performed every three (3) years. **Docket No. 59,** at ¶ 39. The lead auditor, however, can elect to perform the audits more often whenever a facility is showing a significant deviation of the standards. *Id.* After the inspection phase is completed, the principal auditor meets with Baxter's management and EHS personnel in order to notify the preliminary findings of the inspection. *Id.* at ¶ 40. Eventually, the EHS Corporate auditors prepare an Auditor's Report in which they list all the findings noted in the audit. *Id.* at ¶ 41. Major non-conformities are: (1) a serious deficiency that poses significant EHS risk to the Company; (2) failure to comply with an important regulatory requirement that exposes the Company to significant risks; or (3) a lack of a key EHS management or control system. *Id.* at ¶ 42. Additionally, non-conformities that are repeated from previous audits have an increased probability of being classified as "major." *Id.*[6] Ultimately a final audit report is delivered. **Docket No. 63,** at Ex. 11 at ¶ 10.[7] One of the main reasons that Baxter conducts an EHS Corporate Audit is to verify that the facility is complying with regulations in order to maintain its certifications. **Docket No. 59,** at ¶ 45. Without its certifications, such as the ISO 14001 Certification, Baxter cannot do business internationally. *Id.* at ¶ 46.

Beside the EHS Corporate Audit, the EHS Department also conducts its own audits. *Id.* at ¶ 47. As the chairman of the PSET team, plaintiff was in charge of the internal audit. *Id.* at ¶ 50. Prior to the execution of the corporate audit, the auditors advanced a "checklist" to the facility which listed the areas to be inspected during their visit. *Id.* at ¶ 51. The members of the EHS Department used said checklist to perform an internal audit prior the corporate audit. *Id.*

### C. 2003 Corporate Audit

On February 23, 2003, an EHS Corporate Audit ("2003 Audit") was performed at the facility. In the 2003 Audit, numerous problems were identified. *Id.* at ¶ 53. Due to the significance of the violations identified, on March 21, 2003, the EHS Corporate assessment team recommended the immediate suspension of the ISO 14001 Certification for the facility. *Id.* at ¶ 54. Consequently, on June 23, 2003, Paul Weise ("Weise"), Client Manager of ERM Certification and Verification Services (ISO 14001), sent a letter to Michael A. Cycyota, Baxter's Director of Corporate EHS Audits, stating that the ISO 14001 Certificate held by the facility was suspended pending corrective actions by the site and further assessment once these corrective actions were implemented. *Id.* at ¶ 55. Weise explained that the ISO 14001 Certification was to be suspended for a period of six months or after a revisit to verify progress in correcting these issues. *Id.* at ¶ 56. According to Weise, the certification was suspended as a result of three major non-conformities regarding the way in which environmental issues were managed. The three major deficien-

---

**6.** A repeated violation is considered a major or serious finding since it is understood that the facility failed to adequately resolve the flaws detected in the previous audit. *Id.* at ¶ 43.

**7.** Defendants' claim that it takes "several months" to receive the final audit report is not supported by the cited exhibit. *Id.*

cies outlined in the audit report were:: (1) lack of effectiveness in the manner in which corrective and preventive actions are managed; (2) failure to complete a required process safety management assessment and the presence of piping concerns in the field; (3) concerns that the inspection processes were not identifying significant issues. *Id.* at ¶ 57. The Corrective and Preventive Action ("CAPA") is a quality control program used in the facility to correct any negative EHS issue and establish a correction plan to prevent safety issues from reoccurring. *Id.* at ¶ 58. Plaintiff was in charge of, among other things, the Process Safety Management up to the date of the February 2003 Audit. *Id.* at ¶ 59. Plaintiff blamed the outcome of the 2003 Audit on under-staffing. **Docket No. 70,** Ex. 2 at 181. According to plaintiff, many of the things that needed to be done were not done because they did not have enough personnel to do them. *Id.* Notwithstanding the negative outcome of the audit, no disciplinary action was taken. **Docket No. 59,** at ¶ 63.

### 1. Arrival of Astrid Hernández

As part of the efforts to re-secure the ISO 14001 Certification, Baxter's General Manager, Ediol Ghigliotty ("Ghigliotty"), decided to recruit someone with specific expertise in the area of Process Safety Management ("PSM"). *Id.* at ¶ 64. Astrid Hernández ("Hernández")[8] was hired on August 11, 2003, to provide additional support to the EHS Department's Process Safety Management, Hazardous Operability ("HAZOP") and Industrial Hygiene ar-

eas. *Id.* at ¶ 65. The job posting for the position stated that the new employee was going to share responsibilities with plaintiff. *Id.* at ¶ 66. After being hired, Hernández worked in preparation for the upcoming visit by the EHS Corporate audit team. *Id.* at ¶ 68.[9] According to defendants, whenever plaintiff was undergoing medical treatment or out of the facility, Hernández performed some of his duties. *Id.* at ¶ 71. Plaintiff strongly disagrees and claims that Hernández began to perform his tasks even while he was at work.

### 2. Reassessment of Facility

From August 26 to August 28 of 2003, the Corporate EHS auditors revisited the facility to reassess their prior findings. *Id.* at ¶ 72. After the audit, the auditors recommended the reinstatement of the ISO 14001 Certification pending the closure of the following: (1) the completion of the Process Safety Management ("PSM") audit; and (2) the completion of the hazardous waste storage tank testing and inspection item identified during this assessment. *Id.* at ¶ 73. Accordingly to Ghigliotty, Hernández' work since being retained was instrumental in obtaining this favorable recommendation. *Id.* at ¶ 74.

### D. 2005 EHS Corporate Audit & Plaintiff's disciplinary suspension

On March 2005, another audit was performed in the facility. *Id.* at ¶ 75. According to the audit, the site's performance in Health and Safety management systems had significant deficiencies. *Id.* For in-

---

8. Hernández has a B.S. in Chemistry and a Masters Degree in Industrial Hygiene. *Id.* at ¶ 67. Prior to joining Baxter, Hernández worked at General Electric as the Environmental, Health and Safety Manager. *Id.* She had also worked at Pall Puerto Rico & Biomedical as the Coordinator of Safety and Industrial Hygiene, held the position of Safety Coordinator at Panzardi ERM, and worked as an Industrial Hygienist for OSHA. *Id.*

9. Plaintiff indicated that he had too many simultaneous responsibilities to deal with and that Hernández's hiring benefitted him. *Id.* at ¶ 69. Additionally, he testified that Hernández's recruitment was a good business decision on behalf of Baxter because she provided help in the areas of safety and occupational health. *Id.*

stance, the audit showed that three of the four major findings involved multiple repeats from previous audits. *Id.* In particular, the auditors were concerned with the Workplace Assessment since this issue had been noted in four previous audits. *Id.* Given the number of repeat observations and the inability of the personnel involved to meet their responsibilities, the auditors recommended the site be evaluated the following year rather than within the normal three year cycle. *Id.* at ¶ 77. The results of the 2005 EHS Corporate Audit ("2005 Audit") triggered an internal investigation to determine the root cause for the deficiencies found in the audit. *Id.* at ¶ 78. Further, a multidisciplinary team was assigned to investigate the reasons that contributed to the failure to perform the annual Confined Space Entry (one of the noted problems). *Id.* at ¶ 79. The following people were part of said team: Ivan Cosme (Validation Superintendent), Vivian Peña (Senior Industrial Engineer), Márquez (Human Resources Director) and Virgilio Colón (Logistics Manager). *Id.*[10]

As part of the investigation, the team considered the 2005 Audit, related documental evidence and interviewed several individuals. *Id.* at ¶ 80. During said investigation, Vélez and plaintiff were interviewed to determine their participation in completing the Confined Space Entry System. *Id.* at ¶ 81. The investigation concluded that plaintiff, the person responsible to perform the assigned tasks, did not complete them. *Id.* at ¶ 82. Pursuant to the team's findings, the missed tasks were clearly stated and listed within plaintiff's Personal Management Objectives ("PMO") and in the Standard Operating Procedures ("SOP"). *Id.* The investigation team concluded that plaintiff was a major contributor to Baxter's noncompliance. *Id.* Plaintiff acknowledged that he was accountable for the finding related to the Confined

Space Entry System for the 2005 Audit. *Id.* at ¶ 83.

As a result of the multidisciplinary team's findings, on September 15, 2005, plaintiff was suspended for five days from his job and docked the corresponding salary. *Id.* at ¶ 86. The decision to suspend plaintiff was made by Ghigliotty and was conveyed to plaintiff by Vélez. *Id.* According to Ghigliotty, the temporary suspension from employment was based on the 2005 audit findings. *Id.* Plaintiff alleges that his suspension was discriminatory because he was the only one disciplined for the failed audit even though others had also incurred in mistakes. *Id.* at ¶ 164.

A month earlier, on August 22, 2005, Vélez received a written warning from Ghigliotty stating that "as the direct supervisor of the person in charge to perform the industrial hygiene surveys, you failed to comply with previous commitments to perform mentioned surveys. . . . ." *Id.* at ¶ 89. In addition, two other employees were disciplined as a result of the 2005 audit findings. *Id.* at ¶ 100. Specifically, employees Julio Rosa–Soto and Ramón Torres–Ildefonso, were both suspended for two days for their violations of the SOP regarding the "Transfer Instructions for Specific Raw Materials." *Id.*

### E. State Insurance Fund

On September 27, 2005, plaintiff began receiving treatment from the State Insurance Fund ("SIF"). *Id.* at ¶ 101. Plaintiff was discharged from the SIF on January 12, 2006, and returned to work on February 9, 2006. *Id.* The SIF determined that plaintiff's emotional condition was not job related. *Id.*

### F. 2006 Internal Audit

In anticipation of the 2006 EHS Corporate Audit ("2006 Audit"), an internal audit

---

**10.** Plaintiff claims that this investigation was discriminatory.

was performed of the records of vessel entries, SOP GN 0014 (Confined Space Entry Permit) from year 2005 and 2006. *Id.* at ¶ 102. Plaintiff was present during the internal audit. *Id.* The auditors were Vivian Peña and Virgilio Colón. *Id.* The audit noted, amongst other things, that "after evaluating the Confined Space Entry System it was determined that there is no control of neither the issuances nor the returns of the Hot, Cold, Vessel Entry, work orders notebooks and of the Vessel Entry Record, making it very difficult to assure EHS receives the total quantity of documents used to record these entries." *Id.* at ¶ 103. At that time, plaintiff was responsible for the Confined Space Entry System. *Id.* at ¶ 104. The internal auditors further noted that "the lack of this control prevents EHS to be 100% sure that all the documents are returned and are properly audited for errors and/or missing information." *Id.* at ¶ 105. The auditors recommended that plaintiff "improve the control of the Confined space entry program." *Id.* at ¶ 106.

### G. 2006 EHS Corporate Audit

Several days after the internal audit, on October 23, 2006, another corporate audit was performed. *Id.* at ¶ 107. Again, the outcome showed deficiencies in the EHS area. *Id.* Three of the audit findings, including one major observation, were of areas under plaintiff's responsibility. *Id.* The 2006 EHS Corporate Audit findings that were part of plaintiff's responsibilities were, among others: (1) Management System on Corrective and Preventive (CAPA) issue (001 GUY–06(C)) (this finding was classified as a major observation due to its repetitiveness); (2) gaps in the EHS Inspection Process issue (004–GUY–06(C)); and (3) sprinkler Heads Partially Blocked issue (015–GUY–06(G)) and Performance Reporting Incomplete issue (002–GUY–06(C)). *Id.* at ¶ 108. Plaintiff testified that he was responsible for the three find-

ings described in the 2006 Audit: 001–GUY–06C (Management system on CAPA); 005–GUY–06C (Accident Investigation CAPA Tracking Process); and 004–GUY–06C (EHS Inspection Process Gaps). *Id.* at ¶ 109. Nonetheless, plaintiff claims that defendants' actions with regards to these problems were discriminatory inasmuch as others, who had their own problems during the audit, were not disciplined. **Docket No. 70,** Ex. 23 at 81.

### H. Plaintiff's Termination

On December 8, 2006, plaintiff was terminated for his alleged poor work performance, his lack of commitment towards Baxter and the magnitude of the repeated deficiencies found in the 2006 Audit. **Docket No. 59,** at ¶ 111. The decision to terminate plaintiff was made by Ghigliotty. *Id.* at ¶ 112. Accordingly to Ghigliotty, the decision was made solely on the basis of plaintiff's shortcomings as reflected in the 2006 Audit. *Id.* In reaching this decision, Ghigliotty claims that plaintiff had not taken advantage of the opportunities previously given to him. *Id.* at ¶ 113. Specifically, he states that: (1) plaintiff was not subjected to an adverse employment action even though the 2003 Audit that led to the suspension of the ISO 14001 Certification pointed to deficiencies in areas within plaintiff's responsibilities; (2) plaintiff was temporarily suspended in 2005 due to the deficiencies reflected in the 2005 Audit; and (3) that although the plaintiff was warned that any future violation would result in his termination, he neglected his duties once again as reflected and concluded in the 2006 Audit. *Id.*

In addition to terminating plaintiff, Ghigliotty made the decision to terminate Vélez. *Id.* at ¶ 114. However, since Vélez was on medical leave at the moment said decision was made, Ghigliotty postponed Vélez termination. *Id.* One of the medical

tests performed on Vélez revealed a heart condition. *Id.* at ¶ 115. Shortly after, and without medical clearance from his physician, Vélez showed up at work. *Id.* Vélez went to Baxter and sat down with Márquez and Ghigliotty in Baxter's conference room. *Id.* After "small talk," Ghigliotty took a bathroom break, at which time, in the absence of Ghigliotty, Vélez told Márquez that he had not received medical clearance to return to work, particularly so, because it was discovered during his sick leave that he had a heart condition that required special treatment. *Id.* When Ghigliotty returned from the bathroom, Márquez informed him of Vélez' situation. *Id.* at ¶ 116. Accordingly, considering that Vélez was a heart patient and they did not want to upset him with the news (of his termination) and combined with the fact that he was not authorized to return to work, they allegedly decided to postpone Vélez termination or communicating to Vélez their decision. *Id.* Vélez never received a medical clearance and went on to receive long-term disability benefits provided through a private insurance carrier. *Id.* at ¶ 117.

## I. Plaintiff's Internal Complaints

On December 23, 2003, plaintiff met with Evelyn Valentín ("Valentín"), Human Resources Manager, and, for the first time, complained and alleged that Baxter had discriminated against him because of his hearing impairment. *Id.* at ¶ 118. After conducting an investigation, Baxter concluded that the plaintiff had not been subjected to discriminatory treatment, and that all of the allegedly discriminatory events were prompted by legitimate non-discriminatory reasons. *Id.* at ¶ 119. Later on, after returning from sick leave, on November 4, 2005, plaintiff filed with Valentín a second complaint in which he list-

ed the events he considered discriminatory and that constituted "labor harassment" (or mobbing). *Id.* at ¶ 120. On November 18, 2005, Valentín sent a letter to plaintiff acknowledging receipt of his second internal complaint, and informed plaintiff that she was going to conduct an investigation of the purported events. *Id.* at ¶ 121. After receiving plaintiff's second complaint, a new investigation was instigated. *Id.* at ¶ 122. As part of the investigation, on December 21, 2005, plaintiff met with Márquez and Valentín to discuss his allegations. *Id.* Two days later, Valentín met with Vélez to discuss the same. *Id.* Finally, on January 12, 2006, Baxter concluded its investigation. *Id.* at ¶ 123. Plaintiff was given a letter wherein Márquez stated, among other things, that Baxter did not discriminate against plaintiff because of his disability, age, or any other type of discrimination. *Id.* Also, Márquez stated there was no evidence that would constitute labor harassment or "mobbing." *Id.* After being notified of the results of the investigation, on January 12, 2006, plaintiff filed a discrimination charge with the Antidiscrimination Unit ("ADU"), and the Equal Employment Opportunity Commission ("E.E.O.C."). *Id.* at ¶ 124. On January 19, 2006, plaintiff amended his ADU charge to include an additional discriminating event. *Id.* at ¶ 125. Plaintiff claims that this event occurred on September 23, 2005, but failed to describe slaid event. *Id.*

## J. Facts Related to ADA Claim

Plaintiff testified that his disability discrimination claim rests on the fact that Baxter allegedly discriminated against him because he suffered from a 50% bilateral hearing loss (Tinitus) in each ear.[11] *Id.* at ¶ 127. According to plaintiff, he developed

---

11. Plaintiff claims that he suffers from depression, but has not claimed being discriminated against because of said condition. *See generally* Docket No. 70, Ex. 2 at 67.

said hearing loss while serving in the army on or around 1968. *Id.* at ¶ 128. Plaintiff indicated that since he left the army, on or around 1971, he has been wearing a hearing device. *Id.* at ¶ 129. Further, when the plaintiff wears the hearing device, his hearing capacity is near normal. *Id.* Plaintiff typically wears the hearing device in only one ear, because it bothers him to wear the complete set. *Id.* at ¶ 130. Nonetheless, when wearing just one ear device, plaintiff can perform and hear normally. *Id.* Plaintiff testified that there is no daily life activity that he cannot perform while wearing his hearing device. *Id.* at ¶ 131. Plaintiff contends that about one (1) year after he started his workings at OHMEDA, in 1995, Márquez posted an invitation to identify oneself as disabled. *Id.* at ¶ 132. Consequently, plaintiff decided to inform OHMEDA that he had a hearing condition. *Id.* Plaintiff further alleges that in 1995 he made two (2) requests for accommodation. Reportedly, plaintiff requested an amplifier for his phone, and that people talk to him face to face, in order for him to read their lips. *Id.* at ¶ 133. Plaintiff concedes that both requests for accommodation were granted by the company. *Id.* at ¶ 134.

## K. Facts Related to ADEA Claim

At the time of his deposition, plaintiff was 62 years of age. *Id.* at ¶ 137. Hernández is younger than plaintiff. *Id.* at ¶ 138. Plaintiff avers that when he saw the newspaper advertisement posting his position, he immediately thought he was going to be terminated. *Id.* at ¶ 139. Plaintiff has no knowledge of the circumstances surrounding Hernández recruitment, or hiring. *Id.* In addition, the job posting for the position filled by Hernández stated that the employee was going to "share responsibilities with current Safety and Emergency Response Coordinator." *Id.* at ¶ 140.

Plaintiff alleges that Baxter gave his responsibilities to Hernández to push him aside. *Id.* at ¶ 141. Nonetheless, plaintiff admitted that understaffing was one of the reasons for the shortcomings in the 2003 Audit. *Id.* Moreover, plaintiff testified that many of the things that needed to be done were not done because they did not have enough personnel to complete them. *Id.* Plaintiff also testified that before Hernández' hiring, he had too many simultaneous responsibilities to deal with. *Id.* at ¶ 142. Hence, he testified that she helped him with the workload and that he could manage his responsibilities more effectively. *Id.* Plaintiff admitted that when Hernández joined the EHS team, Baxter delegated her only three of plaintiff's ten functions. *Id.* at ¶ 143. Plaintiff testified that: (1) he does not know who was hired to replace him, (2) what the person's job responsibilities were, and (3) when his replacement was hired. *Id.* at ¶ 144. Plaintiff testified that the only adverse employment actions he suffered were his 1995 demotion, his 2005 suspension and his 2006 termination. *Id.* at ¶ 145.

## L. Facts Related to Retaliation Claim

On April 20, 2004, plaintiff started receiving treatment at the SIF. *Id.* at ¶ 187. On November 1, 2004, plaintiff got discharged from the SIF, which determined that his condition was not work related. *Id.* at ¶ 188. On September 27, 2005, plaintiff once again started receiving treatment from the SIF. *Id.* at ¶ 189. On February 9, 2006, plaintiff was discharge from the SIF because he did not suffer a work related condition. *Id.* at ¶ 190.

On January 12, 2006, plaintiff filed a discrimination charge with the ADU, and the E.E.O.C. *Id.* at ¶ 191. On January 19, 2006, plaintiff amended his ADU charge to

include what he claims was the "latest discriminating event on behalf of Baxter." *Id.* at ¶ 192. Although he claims that this event occurred on September 23, 2005, he did not describe the alleged discriminating event. *Id.* Presumably, plaintiff was referring to his suspension. *Id.*

## II. Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." *Thompson v. Coca–Cola Co.,* 522 F.3d 168, 175 (1st Cir.2008) (citing Fed. R. Civ P. 56(c)). When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Cox v. Hainey,* 391 F.3d 25, 27 (1st Cir.2004). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000) (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)). In addition, the "absence of evidence on a critical issue weighs against the party—be it either the movant or nonmovant—who would bear the burden of proof on that issue at trial." *Alamo Rodríquez v. Pfizer Pharma.,* 286 F.Supp.2d 144, 151 (D.P.R. 2003) (citing *Pérez v. Volvo Car Corp.,* 247 F.3d 303, 310 (1st Cir.2001)).

"A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Thompson,* 522 F.3d at 175 (quoting *Sánchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996)) (internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. P.R. Ports Auth.,* 515 F.3d 20, 25 (1st Cir.2008). To defeat a properly supported motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." *Pérez,* 247 F.3d at 317 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vázquez v. López–Rosario,* 134 F.3d 28, 33 (1st Cir.1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. Analysis

### A. Statute of Limitations

Baxter's first argument is that some of plaintiff's complain of "discriminatory" events should not be considered by the court because they are bared by the applicable statute of limitations. The court agrees.

In their complaint, plaintiffs allege discriminatory acts, as well as adverse employment actions, dating back as far as 1995. Specifically, plaintiffs allege the following: (1) certain discriminatory comments were made by plaintiff's supervisors in or around 1995 once it was discovered that he was hearing impaired; (2) plaintiff's disclosure of his hearing impairment led to his demotion from the position of Employee Safety Manager to Training Coordinator in 1995; (3) Hernández, who was under the age of forty, was hired in 2003 and slowly phased plaintiff out of his job; (4) in 2005, plaintiff, because of his age and disability, was disciplined for negative audit results, while other responsible parties were not; and (5) in 2006, plaintiff was fired because of his age, disability and as a retaliatory tactic. As the record re-

flects, plaintiff filed internal discrimination complaints in 2003 and 2005, and filed a discrimination charge with the ADU and the E.E.O.C. in January of 2006. Based on the foregoing, Baxter argues that any claim not brought within three-hundred days of January 12, 2006, the day plaintiff filed his E.E.O.C. charge, should not be considered by the court.

■ Both the ADA and ADEA mandate that plaintiffs comply "with the administrative procedures specified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e." *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 (1st Cir. 1999) (ADA claim); *Alicea v. Ondeo De Puerto Rico*, 389 F.Supp.2d 269, 274 (D.P.R.2005) (ADEA claim). Accordingly, "such compliance must occur before a federal court may entertain a suit that seeks recovery for [ ] alleged [ADA and ADEA] violation[s]." *Bonilla*, 194 F.3d at 277. In order to assert claims under the ADA or ADEA, an aggrieved party must file its charge with the E.E.O.C. within one-hundred and eighty days of the alleged discriminatory conduct or within three-hundred days if "the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e–5(e)(1); *Bonilla*, 194 F.3d at 278 (quoting 42 U.S.C. § 2000e–5(e)(1)).[12] The purpose of filing an administrative claim is to provide defendants with "prompt notice of claims and to create an opportunity for early conciliation." *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir.1996). Moreover, "[t]hat purpose would be frustrated if the employee were permitted to allege one thing in the administrative

charge and later allege something entirely different in a subsequent civil action. Consequently, we have stated that, in [cases involving discrimination], 'the scope of the civil complaint is . . . limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of the charge.' " *Id.* (citing *Powers v. Grinnell Corp.*, 915 F.2d 34, 37 (1st Cir.1990)). Finally, "[a]lthough compliance with administrative remedies is not a jurisdictional prerequisite, nevertheless, plaintiff may not circumvent the requirement." *Siaca v. Autoridad de Acueductos y Alcantarillados de P.R.*, 160 F.Supp.2d 188, 194–95 (D.P.R.2001) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 757, 99 S.Ct. 2066, 60 L.Ed.2d 609, (1979)).

■ In the instant action, plaintiff filed his E.E.O.C. charge on January 12, 2006, and amended it on January 19, 2006. Accordingly, far from complying with the three-hundred day filing deadline of both the ADA and the ADEA, plaintiff filed his charge some eleven years *after* the alleged 1995 discriminatory comments and demotion, and more than two years *after* the August of 2003 hiring of Hernández. The Supreme Court has stated that Title VII's timeliness requirement is mandatory, and failure to file within the time period means a potential plaintiff "lose[s] the ability to recover for [the alleged discrimination]." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Further, the court sees no basis for tolling the statute of limitations period in this case, nor do plaintiffs suggest as much. *See Morgan,*

---

**12.** The three-hundred day period is available only in "deferral" jurisdictions. *See* 42 U.S.C. § 2000e–5(e); *see also Mohasco Corp. v. Silver*, 447 U.S. 807, 817, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). Puerto Rico is a deferral jurisdiction, and the Common-

wealth's Department of Labor is empowered to grant or seek relief from unlawful employment practices, and, therefore, authorized within the purview of section 2000e–5(f). *See* 29 C.F.R. § 1601.74 n. 5; *Bonilla*, 194 F.3d at 278.

536 U.S. at 114, 122 S.Ct. 2061 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' "); *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("[F]iling a timely charge of discrimination with the EEOC .... is subject to waiver, estoppel, and equitable tolling."); *Jones v. City of Somerville*, 735 F.2d 5, 8 (1st Cir.1984) ("In the absence of a recognized equitable consideration, the limitation period cannot be extended by even one day."); *see also Delaware State College v. Ricks*, 449 U.S. 250, 261, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) ("[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period."); *West v. Mississippi Dept. of Public Safety*, 37 Fed. Appx. 712 (5th Cir.2002) (same).

Consequently, said events will not be considered by the court.

## B. ADEA Claim

With regards to plaintiffs' ADEA claim, Baxter avers that it should fail inasmuch as plaintiff has failed to establish a *prima facie* case of age discrimination and, alternatively, Baxter has put forth legitimate, non-discriminatory reasons for the employment actions taken against plaintiff. The court agrees with both arguments.

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to prevail in a lawsuit under the ADEA, the plaintiff's age must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (insertion in original); *Hoffman v. Applicators Sales & Serv., Inc.*, 439 F.3d 9, 17 (1st Cir.2006). When there is no direct evidence of discrimination, the plaintiff may prove his case through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bennett v. Saint–Gobain Corp.*, 507 F.3d 23, 30 (1st Cir.2007). Here, plaintiff has not put forth any direct evidence of age discrimination, *see, e.g., Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir. 2002) ("Although ... somewhat murky, the term 'direct evidence' normally contemplates only those 'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.' " (emphasis omitted)), therefore the burden-shifting framework applies. Under *McDonnell Douglas*, it is the plaintiff's burden to establish a *prima facie* case of age discrimination. In order to accomplish this, he must adduce evidence: "(i) that he is a member of the protected group; that is, that he was at least forty years of age when dismissed from his employment; (ii) that his job performance met or exceeded his employer's legitimate expectations; (iii) that his employer actually or constructively discharged him; and (iv) that his employer had a continuing need for the services that he had been rendering." *Bennett*, 507 F.3d at 30 (citing *Dávila v. Corporación De Puerto Rico Para La Difusión Pública*, 498 F.3d 9 (1st Cir.2007)). This *prima facie* showing creates a rebuttable presumption that the defendant-employer violated the ADEA. *See González v. El Día, Inc.*, 304 F.3d 63, 69–70 (1st Cir.2002).

■ Once plaintiff has made out a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its adverse employment action. *See Bennett,* 507 F.3d at 30–31. The defendant's burden at this stage is only a burden of production; the ultimate burden of proof remains always with the plaintiff. *See Domínguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430 (1st Cir.2000) ("The defendant's burden at this stage is only a burden of production; the burden of proof remains with the plaintiff at all times."). If the defendant is able to meet its burden, "the plaintiff no longer can rest on the initial inference of discrimination but, rather, must show that the defendant's articulated reason is pretextual." *Bennett,* 507 F.3d at 31 (citing *Dávila,* 498 F.3d at 16). " 'At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age.' " *Id.* (quoting *Dávila,* 498 F.3d at 16); *see also Torrech–Hernández v. Gen. Elec. Co.,* 519 F.3d 41, 47 (1st Cir.2008).

■ It is undisputed that plaintiff meets the first, third and fourth prong of the *prima facie* test, but he falters by failing to show that his job performance met or exceeded Baxter's legitimate expectations. In fact, plaintiff offers no evidence, such as positive reviews, recommendations, promotions, etc., rebutting the essential accuracy of Baxter's dissatisfaction with his job performance. Moreover, plaintiff admitted during his deposition that he had numerous problems during his employment at Baxter. Some of these problems are set forth below.

Due to certain problems encountered during the 2003 Audit—namely, a lack of effectiveness in the manner in which corrective and preventive actions were managed, a failure to complete a required process safety management assessment and the presence of piping concerns in the field, and concerns that the inspection processes were not identifying significant issues—the facilities ISO 14001 Certificate was suspended. Plaintiff was in charge of, among other things, the process safety management up to the date of the 2003 Audit. Plaintiff was not disciplined as a result of these findings.

An investigation performed after the failed 2005 Audit concluded that plaintiff was responsible for the EHS teams' failure to perform the Confined Space Entry Permit system review. Pursuant to the team's report, the missed tasks were clearly outlined in plaintiff's PMO and in the SOP. The investigation team concluded that plaintiff was a major contributor to Baxter's non-compliance. As a result of these findings, plaintiff was suspended for five days from the job and docked his salary. Moreover, plaintiff acknowledged that he was accountable for these errors. Plaintiff was advised at that time to improve his work quality. **Docket No. 64,** Ex. 24 at 2 ("We want to take this opportunity to urge you to improve and focus on meeting your EHS commitments on a timely manner and perform in accordance with our expectations. We also want to make you aware that, should we have these repeated items arise in any other EHS audit, other disciplinary action will be taken, which could include termination.").

In 2006, Baxter conducted its own internal audit, in preparation for the 2006 Audit. The internal audit team explained that "after evaluating the Confined Space Entry System it was determined that there is no control of neither the issuances nor the returns of the Hot, Cold, Vessel Entry, work orders notebooks and of the Vessel Entry Record, making it very difficult to assure EHS receives the total quan-

tity of documents used to record these entries." At said time, plaintiff was responsible for the Confined Space Entry System. The internal auditors further noted that "the lack of this control prevents EHS to be 100% sure that all the documents are returned and are properly audited for errors and/or missing information." Hence, the auditors recommended that plaintiff "improve the control of the Confined space entry program." Again, plaintiff was not disciplined for said finding.

Finally, during the 2006 Audit, three of the audit findings, including one major observation, reflected deficiencies within areas under plaintiff's responsibility. Again, it must be noted that plaintiff testified that he was responsible for the three adverse findings described in the 2006 Corporate Audit: 001–GUY–06C (Management system on CAPA); 005–GUY–06C (Accident Investigation CAPA Tracking Process); and 004–GUY–06C (EHS Inspection Process Gaps). As a result of these findings, plaintiff was terminated.

As is evidenced by the above, plaintiff fails to meet the second prong of the *prima facie* showing. Accordingly, the court need proceed no further. *Dionne v. Potter*, No. Civ. 02–11837, 2005 WL 1527616 (D.Mass. June 21, 2005) (granting summary judgment where plaintiff failed to show that he met the employer's legitimate expectations); *Hillstrom v. Best Western TLC Hotel*, 265 F.Supp.2d 117 (D.Mass. 2003) (same).[13]

**C. ADA Claim**

■■■■ The ADA prohibits certain types of discrimination in the workplace against an otherwise qualified individual with a disability. 42 U.S.C. § 12101, *et seq.* To establish a claim of disability discrimination under the ADA, plaintiff must first establish a *prima facie* case by showing: (i) that he is disabled within the meaning of the ADA; (ii) that he is able to perform the essential functions of his job, with or without reasonable accommodation; and (iii) that the adverse employment decision was based in whole or in part on his disability. *Phelps v. Optima Health Inc.*, 251 F.3d 21, 24 (1st Cir.2001); *Marcano–Rivera v. Pueblo Int'l*, 232 F.3d 245, 251 (1st Cir.2000); *García–Ayala v. Led-*

---

**13.** Even if the *prima facie* showing had been made, plaintiff has failed to establish that the legitimate, non-discriminatory reason put forth by Baxter for his suspension and termination—namely, plaintiff's failure to properly perform the functions of his job—are pretextual. Instead, plaintiff relies on his own belief and speculation about defendants "true" reason for suspending and ultimately terminating him. Moreover, the only "evidence" put forth by plaintiff, by way of his deposition, to support his claim that he was treated differently than other employees is belied by the record, which shows that other employees, including plaintiff's supervisor, were punished for inadequate job performance. See *Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir.1994) ("Even in discriminatory discharge cases, where the plaintiff can rarely present direct, subjective evidence of an employer's actual motive, the plaintiff cannot survive summary judgment with 'unsupported allegations and speculations', but rather must 'point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus.'" (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988))); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (explaining that in discrimination cases, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the discrimination claim). Finally, plaintiff's belief that Hernández should have been punished for her job performance, but was not because Baxter was "protecting" her, and discriminating against him, does not, in and of itself, show that Baxter's stated reason for terminating him is pretextual.

*erle Parenterals, Inc.,* 212 F.3d 638, 646 (1st Cir.2000); *Soto–Ocasio v. Federal Express,* 150 F.3d 14, 18 (1st Cir.1998). If plaintiff is able to establish a *prima facie* case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its employment decision and produce "credible evidence to show that the reason advanced was the real reason" for the employment action. *Tobin v. Liberty Mutual Ins. Co.,* 433 F.3d 100, 105 (1st Cir.2005) (citing *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If defendant offers such a reason, the burden shifts back to plaintiff to establish that defendant's non-discriminatory reason was pretextual. *See id.* At all times the ultimate burden of proving discrimination lies with plaintiff. *Reeves v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

 The first step in the *prima facie* showing requires that plaintiff prove by a preponderance of the evidence that he was "disabled." Baxter argues that plaintiff is not disabled under the ADA inasmuch as his hearing loss did not substantially limit a major life activity.[14]

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The E.E.O.C. has promulgated regulations and issued interpretive guidelines implementing the ADA, which define "impairment" broadly to include "[a]ny physiological disorder, or

condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). Further, it defines "Major Life Activity" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(I). Here, plaintiff clearly has an impairment that affects a major life activity. *See* 29 C.F.R. § 1630.2(i). Hence, the question before the court then is, whether plaintiff's impairment "substantially limits" this major life activity.

An impairment "substantially limits" a major life activity if an individual is unable to perform a major life activity "that the average person in the general population can perform" or is significantly restricted in the ability to do so. 29 C.F.R. § 1630.2(j)(1). In determining whether plaintiff's hearing impairment substantially limits a major life activity, the court must consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (instructing that the phrase "substantially limits" suggests "considerable" or "specified to a large degree"). In making this determination, the court must consider corrective measures,

---

**14.** Plaintiff also claims that he is "disabled" under the ADA due to depression that developed because of Baxter's allegedly discriminatory conduct. Plaintiff, however, puts forth no evidence to show how said depression substantially limited his daily life activities. Further, he testified that his depression was a temporary condition, and that said depression does not normally limit his daily life activities. **Docket No. 70,** Ex. 2 at 67. Based on the same, no reasonable juror could conclude from the record that plaintiff's depression was permanent, would have a long-term impact, or affected any major life activity.

such as hearing aids, that could mitigate plaintiff's impairment. *See Sutton,* 527 U.S. at 475, 119 S.Ct. 2139.

 In the instant case, plaintiff testified that as a result of his impairment, he can only perform his daily life activities when he can hear. **Docket No. 70,** Ex. 2 at 66–67. He further testified, however, that when he wears his hearing devices, his hearing capacity is at near normal levels (100%). *Id.* at 64. Due to discomfort caused by wearing hearing devices in both ears, plaintiff often only wears one of the devices. *Id.* Nonetheless, even while only using one device, plaintiff is still able to function normally. *Id.* Finally, plaintiff testified that his impairment did not stop him from performing any daily life activity. *Id.* Based on the above, plaintiff had failed to prove that his impairment—which is mitigated by corrective measures—substantially limits one or more of his major life activities. *See Sutton,* 527 U.S. at 487, 119 S.Ct. 2139. Therefore, he can only prevail if he shows that Baxter "regarded" him as being impaired. To meet this standard, Baxter must have "mistakenly believed that [plaintiff had] a physical impairment that substantially limits one or more major life activities" or "mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities." *Id.* at 489, 119 S.Ct. 2139. It is insufficient for plaintiff to show that Baxter thought he was, in some way, impaired. Rather, plaintiff must show that Baxter thought he was disabled "within the meaning of the statute." *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 381 (3d Cir.2002). Plaintiff has failed to do such here.

Since plaintiff has failed the first prong of the *prima facie* test, the court sees no reason to proceed further.[15]

---

**15.** Even assuming plaintiff had presented a *prima facie* case of discrimination, as previously explained, he fails to show that Baxter's

### D. Retaliation Claim Under the ADA

 To make out a *prima facie* case for retaliation under both the ADEA and ADA, a plaintiff must show that: (1) he or she engaged in protected conduct; (2) he or she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *See Calero–Cerezo v. U.S. Dept. Of Justice,* 355 F.3d 6, 25 (1st Cir.2004) (*citing Gu v. Boston Police Dep't.,* 312 F.3d 6, 14 (1st Cir.2002)); *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1st Cir.1997); *Torres–Alman v. Verizon Wireless Puerto Rico, Inc.,* 522 F.Supp.2d 367, 394 (D.P.R. 2007); *Vizcarrondo v. Board of Trustees of Univ. of Puerto Rico,* 139 F.Supp.2d 198, 204 (D.P.R.2001); *see also Soileau v. Guilford of Maine,* 105 F.3d 12, 13 (1st Cir. 1997) (applying the standard for a retaliation suit under Title VII to retaliation suit brought under the ADA). This *prima facie* case of retaliation has been described as a "small showing" that is "not onerous." *Kosereis v. Rhode Island,* 331 F.3d 207, 213 (1st Cir.2003). Once the plaintiff establishes a *prima facie* showing of retaliation, the burden-shifting analysis articulated in *McDonnell Douglas* applies. *See Calero–Cerezo,* 355 F.3d at 26. As previously discussed, under this framework, the defendant must articulate a legitimate and non-retaliatory reason for its employment decision. *Id.* If the defendant does so, the burden shifts to the plaintiff to show that "the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.*

 While Baxter concedes that plaintiff meets the "protected activity" and the "adverse employment action" prongs of the

---

proffered reason for his suspension and/or termination was pretextual. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817.

*prima facie* case, it contends that he is unable to show the required causal connection between his protected activity and his suspension or termination. As the law makes clear, "[t]here are many sources of circumstantial evidence that ... can demonstrate retaliation in a way sufficient to leap the summary judgment" hurdle. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 828 (1st Cir.1991). One way is to show a close temporal proximity between the protected conduct and the adverse employment action. *Wyatt v. City of Boston,* 35 F.3d 13, 16 (1st Cir.1994). Another is to show "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action." *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir.2003) (citing *Kachmar v. SunGard Data Sys. Inc.,* 109 F.3d 173, 177 (3rd Cir.1997)).

█ The record here shows that the passage of time between plaintiff's protected conduct and his adverse employment actions were too long to prove a causal connection between the two. Plaintiff's protected conduct—reporting to the SIF on April 20, 2004 and the internal discrimination complaint he submitted on December 23, 2003, took place well over a year before his September 15, 2005, suspension. With regards to the 2006 termination, plaintiff's protected conduct—reporting to the SIF on September 27, 2005 (he was discharged in January of 2006), filing a second internal discrimination complaint on November 4, 2005, and filing a charge with the E.E.O.C. and ADU on January 12, 2006—took place well before his December 8, 2006, termination. Based on the substantial amount of time between plaintiff's protected conduct and the alleged retaliatory acts, plaintiffs have failed to establish a causal relationship between his protected conduct and his suspension and/or termination. *See Centro Médico del Turabo v. Feliciano de Melecio,* 406 F.3d 1, 10 (1st Cir.2005) (explaining that while disciplinary action after engaging in protected conduct is indirect proof of a causal connection, it is equally true the causal connection disappears in the lapse of time); *see, e.g., Bishop v. Bell Atlantic,* 299 F.3d 53 (1st Cir.2002) (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 272–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (if temporal proximity is the only evidence of causality establishing *prima facie* retaliation, proximity must be "very close"; twenty months is insufficient)); *Mesnick v. General Electric Co.,* 950 F.2d 816 (1st Cir.1991) (nine months between E.E.O.C complaint and discharge too long).

Moreover, plaintiff has failed to put forth evidence of discriminatory or disparate treatment in the time period between his protected activity and his suspension and/or termination. While plaintiff claims that he was the only individual punished for failing to adequately perform his tasks, thereby proving disparate and discriminatory treatment by Baxter, the record shows that this is not the case. At least three other employees, including plaintiff's boss, were punished in some way for failing to perform their job functions. Without this argument, plaintiff is left with little else besides his own speculation to establish a causal connection between his protected activity and his suspension and/or termination. Nonetheless, even if plaintiff had established a *prima facie* case of retaliation, based on the record, no reasonable jury could find that defendant's legitimate, non-discriminatory reason for terminating plaintiff was pretextual.

Accordingly, plaintiff's retaliation claim brought pursuant to the ADEA and the ADA fails.

**VI. Pendent Jurisdiction**

█ In light of the above, and since the federal claim has been dismissed, and

no other grounds for jurisdiction exists, the court declines to exercise pendent jurisdiction over plaintiff's remaining Commonwealth claims. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (stating "if the federal claims are dismissed before trial, . . . the state law claims should be dismissed as well.").

## V. Conclusion

Based on the foregoing, defendants' motion for summary judgment (**Docket No. 61**) is **GRANTED.** Accordingly, plaintiffs' federal claims brought pursuant to the ADEA and ADA are **DISMISSED WITH PREJUDICE,** and the claims brought pursuant to Commonwealth law are **DISMISSED WITHOUT PREJUDICE.**
**SO ORDERED.**