# United States Court of Appeals
## For the First Circuit

No. 05-2697

G. DAVID IVERSON AND ACCESS WITH SUCCESS, INC.,

Plaintiffs, Appellants,

v.

CITY OF BOSTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Selya, Lipez and Howard,
Circuit Judges.

Nicholas S. Guerrera, with whom Shaheen Guerrera & O'Leary LLC
was on brief, for appellants.
Kate Cook, Assistant Corporation Counsel, for appellee.

June 30, 2006

**SELYA, Circuit Judge**.  This case requires us to decide whether the self-evaluation and transition plan regulations promulgated by the Attorney General under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12165, are enforceable through a private right of action.  Two of our sister circuits have divided over the appropriate answer to this thorny question.  Compare Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 913-15 (6th Cir. 2004) (holding that the transition plan regulation is not so enforceable), with Chaffin v. Kan. State Fair Bd., 348 F.3d 850, 857-60 (10th Cir. 2003) (holding that both the self-evaluation and transition plan regulations are enforceable in that manner).  After careful consideration, we conclude that recent Supreme Court precedent dashes any hope that these regulations are so enforceable.  We also conclude that the plaintiffs' other arguments are unavailing and, accordingly, affirm the district court's grant of summary judgment in the defendant's favor.

## I.  BACKGROUND

Plaintiff-appellant G. David Iverson resides in Boston, Massachusetts.  He is a paraplegic who uses a wheelchair in order to move about the city.  Paraplegia qualifies as a disability within the meaning of the ADA.  See 42 U.S.C. § 12102(2)(A) (defining "disability" for ADA purposes as "a physical or mental impairment that substantially limits one or more . . . major life

-2-

activities"). Plaintiff-appellant Access with Success, Inc. (AWS) is a non-profit group, of which Iverson is a member, that advocates equal access to public programs, services, and facilities for disabled persons.

On August 20, 2004, the plaintiffs filed suit in the federal district court alleging that defendant-appellee City of Boston had failed to provide disabled persons with equal access to its programs, services, and facilities. The gravamen of the complaint was that many municipal facilities, including streets, sidewalks, and public buildings, lacked adequate means of ingress and egress for wheelchair-bound persons. The complaint made particular mention of the condition of municipal sidewalks, charging that they "lack proper curb cuts and/or curb ramps" and "contain obstacles which block or impede the accessible path of travel."

The plaintiffs' complaint contained three statements of claim. Count 1 alleged that the self-evaluation and transition plan regulations promulgated by the Attorney General under Title II of the ADA, see 28 C.F.R. §§ 35.105, 35.150(d), imposed an affirmative obligation on the City both to evaluate its conformance with the ADA and to make structural changes to bring its existing facilities into compliance; that the City failed to satisfy the regulatory mandate within the allotted time frame; and that the

-3-

plaintiffs were entitled to remedy this failure via a private right of action.

Count 2 of the complaint incorporated the allegations contained in count 1 and charged that the City's default of its regulatory obligations could be corrected through the instrumentality of a private right of action under section 504 of the Rehabilitation Act. See 29 U.S.C. § 794(a) (providing that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"). The plaintiffs represent that counts 1 and 2 are intended to be "mirror images" of each other. Since the parties have briefed and argued this appeal as though the ADA and Rehabilitation Act claims are coterminous, we construe counts 1 and 2 as presenting a single claim. Cf. Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998) (noting that "Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision"). For ease in reference, we discuss that claim in terms of the ADA.

Count 3 of the complaint asserted a parallel state-law cause of action under Mass. Const. art. 114 and Mass. Gen. Laws ch. 93, § 103. The district court dismissed that claim without prejudice for failure to exhaust state administrative remedies.

-4-

Inasmuch as the plaintiffs do not fault that dismissal, we make no further allusion to count 3.

The City moved to dismiss. <u>See</u> Fed. R. Civ. P. 12(b). As to counts 1 and 2, the City proffered three grounds for dismissal: (i) that the plaintiffs failed to allege any specific injury and, therefore, lacked standing to sue; (ii) that the self-evaluation and transition plan regulations were not enforceable by means of a private right of action; and (iii) that the claims were time-barred.

The plaintiffs directed their opposition mainly to the standing challenge. In an attempt to establish that Iverson and other wheelchair-bound persons within AWS's constituency had suffered concrete injuries as a result of the City's regulatory noncompliance, the plaintiffs served two affidavits.

In the first of these, Iverson chronicled his difficulties in operating his wheelchair in the area near his home due to the substandard condition of municipal streets and sidewalks, protested the dearth of accessible parking spots in the neighborhoods he frequents, and complained of "numerous obstacles to access" at the Boston Public Library. The second affidavit, from another AWS member, contained comparable statements. These two affidavits, the plaintiffs posited, defeated the claim that they lacked standing.

-5-

As to the second and third proffered grounds for dismissal, the plaintiffs' opposition reiterated the bald-faced claim that the self-evaluation and transition plan regulations were enforceable by private rights of action. The opposition also explained why, in the plaintiffs' view, no applicable statute of limitations barred the suit. The plaintiffs made no mention of — and no attempt to develop — any alternate theory of municipal liability.

While the plaintiffs maintained that the complaint contained sufficient allegations to establish both standing and a right to relief under Title II, they invited the district court, in the alternative, either to grant leave to amend the complaint to incorporate the factual averments contained in the affidavits or to treat the motion to dismiss as a motion for summary judgment (and, thus, bring the affidavits into play). The district court accepted the second of these alternatives and converted the motion to dismiss into a motion for summary judgment. See Fed. R. Civ. P. 12(b); see also Fed. R. Civ. P. 56(c).

The court proceeded to grant summary judgment in the City's favor. Acknowledging that the plaintiffs had encountered "hindrances" in the use of public facilities and assuming that the City had failed seasonably to comply with the self-evaluation and

transition plan regulations,[1] the court decided the case on the ground that the plaintiffs had not demonstrated any causal connection between the City's alleged regulatory noncompliance and the plaintiffs' alleged injuries.

The plaintiffs filed a timely motion for reconsideration, see Fed. R. Civ. P. 59(e), asseverating that the district court's judgment rested upon two errors of law, namely, (i) that in finding an absence of causation, the court applied an overly demanding pleading standard and (ii) that the court had disregarded the plaintiffs' barrier-removal claim. Following the summary denial of the motion for reconsideration, this appeal ensued.

## II. ANALYSIS

On appeal, the plaintiffs' principal position is that the self-evaluation and transition plan regulations are enforceable via private rights of action and that they made out a trialworthy issue as to whether the City had complied with these regulations. Their fallback position is that the case, at the very least, should have been allowed to proceed on their alternate barrier-removal theory. Finally, the plaintiffs assign error to the denial of their motion for reconsideration. After briefly delineating the standard of review, we consider these points one by one.

---

[1]The City asserts that it did, in fact, conduct the obligatory self-evaluation and develop the requisite transition plan within the allotted time span. Our resolution of this case renders this factual dispute immaterial.

## A. **The Standard of Review**.

The applicable standard of review is familiar: we assay a district court's entry of summary judgment de novo. See DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005). In conducting this tamisage, we construe the evidence in the light most flattering to the nonmovants (here, the plaintiffs) and indulge all reasonable inferences in their favor. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). We are not, however, tied to the district court's rationale but may affirm the judgment on any ground revealed by the record. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

Summary judgment is appropriate only where the record, construed in the manner limned above, discloses "no genuine issue of material fact" and demonstrates that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "it may reasonably be resolved in favor of either party" at trial, Garside, 895 F.2d at 48, and material if it "possess[es] the capacity to sway the outcome of the litigation under the applicable law," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (citation and internal quotation marks omitted). The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Garside, 895 F.2d at 48. Withal, a measure of

factual specificity is required; "a conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation' is insufficient to discharge the nonmovant's burden." DePoutot, 424 F.3d at 117 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## B. **The Regulatory Noncompliance Claim**.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I of the ADA proscribes disability-related discrimination in employment matters. See id. § 12112. Title III proscribes disability-related discrimination in the provision of public accommodations such as hotels, restaurants, and theaters. See id. §§ 12182, 12184. This case involves Title II, which broadly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132. A "qualified individual with a disability" is

> an individual with a disability who, with or
> without reasonable modifications to rules,
> policies, or practices, the removal of
> architectural, communication, or
> transportation barriers, or the provision of
> auxiliary aids and services, meets the
> essential eligibility requirements for the
> receipt of services or the participation in

> programs or activities provided by a public entity.

Id. § 12131(2). The term "public entity" includes "any State or local government" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." Id. § 12131(1)(A)-(B). The City does not dispute that Iverson is a qualified individual with a disability or that it is a public entity.

The clear purport of Title II is to guarantee that qualified disabled persons enjoy meaningful access to public services, programs, and activities. See Tennessee v. Lane, 541 U.S. 509, 531-32 (2004). To this end, the ADA authorizes the Attorney General to promulgate regulations implementing its provisions. See 42 U.S.C. § 12134(a).

Promulgated under this authority, the self-evaluation regulation directed all public entities, by April 5, 1994, to "evaluate [their] current services, policies, and practices, and the effects thereof" for compliance with Title II. 28 C.F.R. § 35.105(a). If this self-evaluation indicates the need for modification of a public service, policy, or practice in order to achieve Title II compliance, the public entity is directed to make the modification. See id.

A second regulation addresses a public entity's responsibilities vis-à-vis "existing facilities," a phrase that includes "all or any portion of [its] buildings, structures, sites,

-10-

complexes, . . . roads, walks, [and] passageways" that were in existence at the time of the ADA's enactment. Id. § 35.104. Consistent with Title II's emphasis on "program accessibility," the regulatory scheme generally does not require public entities to retrofit their existing facilities. See Lane, 541 U.S. at 532; see also 28 C.F.R. § 35.150(a)(1). Rather, the regulations permit a public entity to select among a number of alternatives for accomplishing program accessibility, including the relocation of services, the reassignment of personnel, and the structural modification of existing facilities. See 28 C.F.R. § 35.150(b)(1). In all events, public entities are excused from undertaking any compliance measures that "impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service." Lane, 541 U.S. at 532 (citing 28 C.F.R. § 35.150(a)(2)-(3)).[2]

If structural changes to existing facilities are to be undertaken to accomplish program accessibility, the transition plan regulation directs a qualifying public entity to "develop, within

---

[2]The regulations governing a public entity's construction of new facilities and its voluntary alteration of existing facilities are far more demanding. When a public entity undertakes such an endeavor, it must, to the maximum extent feasible, ensure that the newly constructed or renovated facility "is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)-(b). With respect to newly constructed or altered streets and sidewalks, the regulations require the installation of curb cuts or comparable means of ingress and egress for disabled persons. See id. § 35.151(e)(1)-(2).

-11-

six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes." 28 C.F.R. § 35.150(d)(1). Public entities with responsibility over streets, roads, or walkways bear an additional burden; the regulation requires those entities to craft, in their transition plan, "a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving . . . State and local government offices and facilities, transportation, places of public accommodation, and employers." Id. § 35.150(d)(2). And, finally, the transition plan regulation mandates that any structural changes to existing facilities "be made within three years of January 26, 1992, but in any event as expeditiously as possible." Id. § 35.150(c).

It is beyond peradventure that, in certain aspects, Title II creates a private right of action against noncompliant public entities. See 42 U.S.C. § 12133; see also Lane, 541 U.S. at 517. Here, however — with the exception of their fallback argument, to which we shortly shall return — the plaintiffs do not claim a direct violation of Title II; instead, they claim violations of, and concomitant rights to enforce, the self-evaluation and transition plan regulations. As we explain below, this is an important distinction.

An implementing regulation may under certain circumstances be enforced through the private right of action

-12-

available under the organic statute that it implements. See Alexander v. Sandoval, 532 U.S. 275, 284-85 (2001). Under Sandoval, however, a private plaintiff may not, merely by referencing the organic statute, enforce regulations that interdict a broader swath of conduct than the statute itself prohibits. After all, the power to create a private right of action, like the power to create positive federal law itself, lies exclusively with Congress. See id. at 286; Bonano v. E. Carib. Airline Corp., 365 F.3d 81, 84 (1st Cir. 2004). Accordingly, a private right of action may be conceived only by a statute that clearly evinces congressional intent to bestow such a right. See Sandoval, 532 U.S. at 286-87.

Sandoval itself aptly illustrates this point. Citing the tenet described above, the Sandoval Court held that an implementing regulation, on its own, cannot create a private right of action. See id. at 291; see also Bonano, 365 F.3d at 84.

To be sure, this holding does not foreclose all private regulatory enforcement. Although a regulation "may not create a right that Congress has not," it "may invoke a private right of action that Congress through statutory text created." Sandoval, 532 U.S. at 291. Thus, while it is vecordious to speak in terms of a cause of action to enforce an implementing regulation separate and apart from its organic statute, a regulation that simply effectuates an express mandate contained in the organic statute may

-13-

nonetheless be enforceable through the private right of action available under the statute itself. See id. at 284. In contrast, a regulation that announces an obligation or a prohibition not imposed by the organic statute may not be enforced under the aegis of a statutory right of action. See id. at 284-85. So viewed, the dispositive question is whether the regulation either forbids conduct that the statute allows or imposes an obligation beyond what the statute mandates. If that question produces an affirmative answer, the regulation is not privately enforceable. See id.

Applying these principles, the Sixth Circuit has held that the transition plan regulation is not enforceable through the instrumentality of Title II's private right of action. See Ability Ctr., 385 F.3d at 913-15. Although the development of a transition plan "may ultimately facilitate compliance with Title II," the court explained, "there is no indication that a public entity's failure to develop a transition plan [seriously] harms disabled individuals" or that a public entity cannot make its services, programs, or activities accessible to qualified disabled persons without first developing a transition plan. Id. at 914. In short, the transition plan regulation imposes an obligation beyond the statutory mandate and, therefore, is not privately enforceable. Id.

-14-

We embrace this reasoning. We add, moreover, that it also dooms the plaintiffs' attempt to enforce the self-evaluation regulation through a private suit. Nothing in the text of Title II requires public entities to conduct self-evaluations, let alone to do so by the date prescribed in the regulation. Conducting a self-evaluation may well facilitate compliance with the strictures of Title II — but a municipality's failure to self-evaluate does not in and of itself render municipal services, programs, or activities inaccessible to disabled persons. Put another way, it is altogether conceivable that a public entity may be in full compliance with Title II without observing the commands of the self-evaluation regulation. Given this state of affairs, we hold that the self-evaluation regulation imposes a burden on public entities not imposed by Title II itself and, therefore, is not enforceable through the instrumentality of Title II's private right of action.[3]

---

[3]At the expense of carting coal to Newcastle, we add that the regulations at issue here do not actually require the City to undertake the measures sought by the plaintiffs. The complaint prays for structural changes to existing facilities, including the installation of curb cuts and the creation of accessible parking spaces. But, the self-evaluation regulation requires public entities to evaluate and modify only "services, policies, and practices," not facilities, where needed to achieve Title II compliance. 28 C.F.R. § 35.105(a). Similarly, the transition plan regulation requires public entities to set schedules for effectuating structural changes to existing facilities only where structural changes to facilities will be undertaken to comply with Title II. See id. § 35.150(d). This formulation begs the question of whether the public entity has chosen structural changes to existing facilities as a method for achieving Title II compliance.

-15-

In an effort to blunt the force of this reasoning, the plaintiffs note that the Tenth Circuit has held that the self-evaluation and transition plan regulations, along with several other regulations promulgated under Title II, are enforceable through a private suit. See Chaffin, 348 F.3d at 856-60. In our view, the Chaffin court misconstrued Sandoval and, thus, the decision is simply incorrect. Although the court appropriately recognized that "regulations may not create a private cause of action where no such right was intended by Congress in the statute authorizing promulgation of such regulations," id. at 857, it inexplicably disregarded Sandoval's corollary rule that regulations which impose an obligation beyond the statutory mandate are not enforceable through the statutory right of action, see id. at 857-58. In light of this error, we elect to align ourselves with the Sixth Circuit, see Ability Ctr., 385 F.3d at 913-15, and to reject the position of the Tenth Circuit, see Chaffin, 348 F.3d at 856-60.

To recapitulate, the self-evaluation and transition plan regulations impose obligations on public entities different than, and beyond, those imposed by the ADA itself. Consequently, those regulations may not be enforced through the instrumentality of the private right of action available under Title II. On this basis — and without reaching the causation issue that the district court

_____

See id. § 35.150(a)(1), (b)(1).

-16-

found dispositive — we uphold the entry of summary judgment for the City on the plaintiffs' regulatory noncompliance claim.

## C. **The Barrier-Removal Claim**.

The plaintiffs' fallback position is that even if they have no private right of action to enforce the self-evaluation and transition plan regulations, the district court nonetheless erred in neglecting to address an alternate theory of liability: that the City's failure to remove barriers to access at existing facilities constitutes disability-based discrimination. This plaint cannot withstand scrutiny.

We have held, with echolalic regularity, that theories not squarely and timely raised in the trial court cannot be pursued for the first time on appeal. See, e.g., Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993); United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992); Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992); McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991); Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987). This prophylactic rule requires litigants to spell out their legal theories face-up and squarely in the trial court; if a claim is "merely insinuated" rather than "actually articulated," that claim ordinarily is deemed unpreserved for purposes of appellate review. McCoy, 950 F.2d at 22 (citation omitted).

-17-

So it is here. While the plaintiffs' complaint at one point decried the condition of city streets and sidewalks, it contained few facts — and even fewer allegations — that so much as hinted at a barrier-removal claim. District judges are not expected to be clairvoyants — and this was too inscrutable a reference to state a barrier-removal claim.

Let us be perfectly clear. A pleading states a claim upon which relief can be granted only when it contains "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)); see Educadores Puertorriqueños En Acción v. Hernández, 367 F.3d 61, 67-68 (1st Cir. 2004) (emphasizing that the notice pleading requirements of Fed. R. Civ. P. 8(a)(2) incorporate this principle). At a minimum, then, the plaintiffs were required to plead (i) that Iverson (or some other member of AWS) is a qualified individual with a disability; (ii) that such an individual was either excluded from participation in or denied the benefit of some public services, programs, or activities; and (iii) that such exclusion, denial of benefits, or other discrimination was by reason of the individual's disability. See Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000). The plaintiffs' complaint offered no meaningful explanation as to how — if at all

-18-

— the conditions of municipal streets and sidewalks deprived Iverson (or anyone else) of access to any public service, program, or activity. For that reason alone, the plaintiffs' barrier-removal claim fails as a matter of pleading.

To cinch matters, the plaintiffs made no mention of a barrier-removal claim in their opposition to the City's dispositive motion. As we wrote in a comparable case, "[c]ourts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion." McCoy, 950 F.2d at 22 n.7. This branch of the raise-or-waive rule serves the salutary purpose of preventing litigants from gaming the system by seeding complaints with Delphic references in the hope of facilitating an escape should the district court's ruling on their advertised claims fail to suit. See id. at 22. Applying that principle, we conclude that the plaintiffs' failure to mention — let alone adequately to develop — the barrier-removal theory in their opposition to the City's dispositive motion defeats their belated attempt to advance the theory on appeal.[4]

---

[4]Even if the plaintiffs had pleaded and preserved their nascent barrier-removal claim (which they did not), that claim would fail on appeal. The district court, at the plaintiffs' urging, converted the motion to dismiss to a motion for summary judgment. The two affidavits filed by the plaintiffs (which are the only materials of evidentiary quality in the summary judgment record) do not contain facts sufficient to make out a trialworthy issue on the barrier-removal claim. See Parker, 225 F.3d at 5 (enumerating the elements of such a claim).

Of course, appellate courts retain a modicum of discretion to relax the raise-or-waive rule in order to prevent miscarriages of justice. See Slade, 980 F.2d at 31. But this authority is to be used sparingly and only in exceptional cases — cases in which "the previously omitted ground is 'so compelling as virtually to insure appellant's success.'" Id. (quoting Hernandez-Hernandez v. United States, 904 F.2d 758, 763 (1st Cir. 1990)). The case at hand does not come close to satisfying this rigorous criterion.

Neither the self-evaluation and transition plan regulations nor Title II itself imposes a duty on a public entity to make structural changes to existing facilities. This fact largely explains the plaintiffs' inability to articulate how the City's alleged failure to comply with the regulations caused the injuries of which they complain; after all, the City, once it conducts a self-evaluation — and it may already have done so, see supra note 1 — may elect to achieve Title II compliance through methods other than the modification of existing facilities. See 28 C.F.R. §§ 35.150(a)(1), (b)(1). Moreover, the plaintiffs have pointed to nothing in the record to buttress their conclusory contention that the City's ostensible failure to remove structural barriers emanated from some disability-based animus. See Ability Ctr., 385 F.3d at 910 ("[A] plaintiff can prevail under [Title II] either by showing 'discrimination' or by showing 'denial of the

-20-

benefits' of public services." (quoting <u>Henrietta D.</u> v. <u>Bloomberg</u>, 331 F.3d 261, 276 (2d Cir. 2003)); <u>cf.</u> <u>Forestier Fradera</u> v. <u>Municipality of Mayagüez</u>, 440 F.3d 17, 22-23 (1st Cir. 2006) (holding that a showing of delay in a municipality's accommodation of a plaintiff's disability, without more, was insufficient to establish the disability-based animus required for actionable discrimination under Title II).  In light of these considerations, there is no reason here to deviate from the raise-or-waive rule.

### D.  **The Motion for Reconsideration**.

The plaintiffs' objection to the lower court's denial of their motion for reconsideration need not detain us.  As said, <u>see</u> <u>supra</u> Part II(C), the plaintiffs failed properly to develop the barrier-removal theory in either their complaint or their opposition to the City's dispositive motion.  It follows, a fortiori, that there was no abuse of discretion in the district court's refusal to address that theory on a motion for reconsideration.  <u>See</u> <u>Aybar</u> v. <u>Crispin-Reyes</u>, 118 F.3d 10, 16 (1st Cir. 1997) (explaining that Rule 59(e) "does not provide a vehicle for a party to undo its own procedural failures [or] allow a party [to] advance arguments that could and should have been presented to the district court prior to judgment" (citation and quotation marks omitted)); <u>see</u> <u>also</u> <u>Tell</u> v. <u>Trs. of Darmouth Coll.</u>, 145 F.3d 417, 420 (1st Cir. 1998).  The presentation of a previously unpled and undeveloped argument in a motion for reconsideration neither cures

the original omission nor preserves the argument as a matter of right for appellate review.  See Tell, 145 F.3d at 420.

In all events, the motion for reconsideration contained scant elaboration of the barrier-removal theory and offered no analysis of how the statute, regulations, or relevant case law supported such a theory on the facts of this case.  That, in itself, was a fatal flaw.[5]  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## III.  CONCLUSION

We need go no further.  The self-evaluation and transition plan regulations impose obligations different than, and beyond, those imposed by Title II of the ADA.  Accordingly, they are not enforceable through the instrumentality of the private right of action available under that statute.  That ends the matter: as explicated above, the plaintiffs neither pleaded nor preserved (and, thus, waived) their claim that the City's failure to remove structural barriers at its existing facilities constituted disability-based discrimination.  For these reasons, we affirm the judgment below.

**Affirmed**.

---

[5]Since our decision, unlike that of the district court, does not rest on a lack of causation, it is unnecessary for us to address the other ground raised in the plaintiffs' motion for reconsideration.

-22-