# United States Court of Appeals
## For the First Circuit

No. 21-1637

PATRICIA MCINTYRE, on behalf of herself and all others
similarly situated,

Plaintiff, Appellant,

v.

RENTGROW, INC., d/b/a Yardi Resident Screening,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Lynch, Selya, and Kayatta,
Circuit Judges.

John Soumilas, with whom James A. Francis, Jordan M. Sartell,
and Francis Mailman Soumilas, P.C. were on brief, for appellant.
Keith Levenberg, with whom James W. McGarry, Joseph F.
Yenouskas, Tierney E. Smith, and Goodwin Procter LLP were on brief,
for appellee.

May 13, 2022

**SELYA**, **Circuit Judge**.  The principal question in this putative class action is whether the facts, taken in the light most congenial to plaintiff-appellant Patricia McIntyre, would permit a rational jury to find that defendant-appellee RentGrow, Inc. (RentGrow) willfully violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681x.  The district court answered this question in the negative and entered summary judgment in favor of RentGrow.  See McIntyre v. RentGrow, Inc., No. 18-12141, 2021 WL 3661499, at *1 (D. Mass. July 22, 2021).  After careful consideration, we affirm.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case.  The abiding truth against which this litigation plays out is that "[c]onsumer credit reports play an important role in the lives of individuals and the economy."  Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 3 (1st Cir. 2022).  Such reports affect the availability and terms of a variety of economic opportunities, including housing.

Congress enacted the FCRA in 1970, in part, "to ensure fair and accurate credit reporting."  Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007).  Recognizing the high stakes that credit reporting portends for consumers, the FCRA requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible

accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

RentGrow is a consumer reporting agency (CRA) that generates reports used by landlords and property managers to screen prospective tenants.  The information contained in these tenant-screening reports includes summaries of public records of court proceedings involving each prospective tenant.  RentGrow neither obtains nor reviews these court records itself but, rather, purchases reports synthesizing the court records from TransUnion Background Data Solutions (TUBDS), which is a subsidiary of TransUnion (one of the three largest CRAs in the United States).

RentGrow conducts some modest filtering to sift out some of the court-records information it receives and then synopsizes the remainder into its tenant-screening reports.  In a declaration signed under penalty of perjury by Patrick Hennessey, RentGrow's vice president of resident screening, RentGrow describes the arrangement in the following terms:

> [W]hen a prospective tenant applies to rent from one of RentGrow's clients, information from the prospective tenant's application is sent to RentGrow electronically.  That information is in turn sent by RentGrow to, among others, [TUBDS].  [TUBDS] then returns civil court records (if any) to RentGrow. RentGrow then makes sure that the information from [TUBDS] is about the tenant applicant (meaning, we make sure it is not information about someone else), makes sure the information can be reported (meaning, for example, if the case was dismissed or does not

> relate to a landlord-tenant action, RentGrow filters it out), and then transmits the reportable civil records information from [TUBDS] about the applicant (if any) to the property [manager].

In deposition testimony, Hennessey indicated that RentGrow was largely unaware of the procedures that TUBDS used to collect its court-records information and what procedures it had in place to ensure the accuracy of that data.

In 2017, McIntyre expressed interest in renting an apartment in Philadelphia, Pennsylvania. The property manager of the apartment complex used RentGrow's services to screen prospective tenants and asked RentGrow for a tenant-screening report. RentGrow, in turn, asked TUBDS for court-records information pertaining to McIntyre.

As matters turned out, McIntyre had a somewhat checkered housing history: three previous landlords had taken her to court in eviction proceedings and related matters. The original tenant-screening report that RentGrow prepared, using court-records information supplied by TUBDS, reflected this history but (McIntyre alleges) contained some meaningful inaccuracies.

Those inaccuracies related to things like the current status of the cases brought against McIntyre and whether the arrearages allegedly owed by McIntyre were still outstanding. For instance, one entry from 2012 showed a suit against McIntyre along with the amount sought in the suit without noting that the

complaint subsequently had been withdrawn. Another entry showed that a suit had been filed and a judgment entered but neglected to mention that the judgment had later been paid.

RentGrow delivered this original tenant-screening report to the property manager, recommending that McIntyre's application be rejected. The property manager determined that McIntyre was ineligible to rent an apartment in the complex.

The rejection of McIntyre's bid to lease the apartment was not the end of the matter. After learning the contents of RentGrow's original tenant-screening report, McIntyre notified RentGrow that she disputed portions of certain entries in the civil court records section. RentGrow promptly notified TUBDS of McIntyre's complaints and updated its tenant-screening report within a month (using newly acquired information from TUBDS). Even with updates to the report, McIntyre remained ineligible to lease the apartment. And in her view, the revisions were too little and too late.

The FCRA furnishes a private right of action to consumers who claim to be harmed by violations of its strictures. See 15 U.S.C. § 1681p. Invoking this private right of action and noting that RentGrow maintained its principal place of business in Waltham, Massachusetts, McIntyre commenced a civil action in the United States District Court for the District of Massachusetts. She sued RentGrow both on her own behalf and as the representative

of a putative class of similarly situated persons.[1]  In her complaint, she alleged that the inaccurate information in the original tenant-screening report, coupled with RentGrow's reliance on TUBDS's court-records information, transgressed section 1681e(b) of the FCRA, see 15 U.S.C. § 1681e(b), and gave rise to liability for both negligent and willful noncompliance with the statute, see 15 U.S.C. §§ 1681o, 1681n.

Negligent noncompliance and willful noncompliance are two different bases of liability for violation of the same substantive obligation. McIntyre's complaint, though, pleaded RentGrow's alleged violation of the statute in a single count. The district court treated that count as a unitary claim, asserting dual theories of liability.  See McIntyre, 2021 WL 3661499, at *13.  For simplicity's sake, we treat negligent noncompliance and willful noncompliance as distinct (but largely overlapping) claims.

For present purposes, it is helpful to distinguish between these two kinds of claims.  The FCRA contains substantive provisions (like section 1681e(b)) that set out the compliance

---

[1] McIntyre sought to certify a class (nationwide, state-wide, and/or city-wide) of persons "who were subjects of tenant screening reports created by [RentGrow] that contained eviction information, but which failed to state that the action had been withdrawn, dismissed, non-suited, or resulted in a judgment for the tenant defendant according to court records dated at least 30 days prior to the date of the report."

duties of CRAs with respect to consumer information.  Section 1681o and section 1681n provide for liability for negligent noncompliance and willful noncompliance, respectively, with those compliance duties.  See 15 U.S.C. §§ 1681n, 1681o.

A negligent noncompliance claim resembles a garden-variety negligence claim, with a substantive provision of the FCRA providing the relevant duty and standard of care.  Section 1681e(b) is the relevant substantive provision here.  It requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information" included in consumer credit reports.  Recovery in negligent noncompliance claims is limited to actual damages and attorneys' fees.  See 15 U.S.C. § 1681o(a).  Thus, such a claim requires a plaintiff to show a failure to follow reasonable procedures for assuring maximum possible accuracy, resulting in inaccurate information in the plaintiff's consumer report and thereby injuring the plaintiff.  See Cortez v. Trans Union, LLC, 617 F.3d 688, 708 (3d Cir. 2010); Philbin v. Trans Union Corp., 101 F.3d 957, 963 (3d Cir. 1996).

Because a willful noncompliance claim rests on the same substantive obligation, its elements are similar to those of a negligent noncompliance claim.  There is an added requirement, though, of showing willfulness.  And unlike a negligent noncompliance claim, a willful noncompliance claim may entitle a plaintiff to statutory and punitive damages and attorneys' fees

without proof of actual damages.[2] See 15 U.S.C. § 1681n(a), (c); see also Llewellyn v. Allstate Home Loans, Inc., 711 F.3d 1173, 1179 (10th Cir. 2013). Thus, a willful noncompliance claim under section 1681e(b) requires a plaintiff to show a willful failure to follow reasonable procedures for assuring maximum possible accuracy, resulting in inaccurate information in the plaintiff's consumer report. See Birmingham v. Experian Info. Sols., Inc., 633 F.3d 1006, 1009 (10th Cir. 2011). Proving willfulness requires the plaintiff to show that the noncompliance was knowing or reckless. See Safeco, 551 U.S. at 57-58; Birmingham, 633 F.3d at 1009.

Following pretrial discovery, RentGrow moved for summary judgment. See Fed. R. Civ. P. 56(a). McIntyre opposed this motion and cross-moved for class certification. See Fed. R. Civ. P. 23(a), (b)(3). Although the parties attach different meaning to them, the number of reports RentGrow prepares using TUBDS's court-records information and its dispute rates are undisputed:

---

[2] Even without a showing of actual damages, a plaintiff who seeks to press a willful noncompliance claim must show an injury in fact sufficient to support standing. See TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2200 (2021). Here, the district court supportably determined that RentGrow's dissemination of allegedly inaccurate information crossed that threshold. See McIntyre, 2021 WL 3661499, at *6.

- 8 -

- TUBDS returned civil court records for use in 380,559 tenant screenings conducted by RentGrow between October 12, 2016 and October 12, 2018.

- After applying its filtering process, RentGrow reported civil court records in 272,893 tenant-screening reports.

- Consumers disputed reports in 6,194 screenings involving civil court records generally (approximately 2.3 percent), and 2,953 of those disputes (approximately 1.1 percent) concerned eviction records specifically.

- With respect to the disputes concerning eviction records, 2,526 (approximately 85 percent) resulted in updates to the tenant-screening reports.

The district court assessed the shared elements of the negligent and willful noncompliance claims under section 1681e(b). First, the court determined that a jury could find that RentGrow failed to follow reasonable procedures to assure maximum possible accuracy. McIntyre, 2021 WL 3661499, at *8. Although the court acknowledged that RentGrow had certain procedures to limit inaccuracies in the tenant-screening reports that it prepared, it noted that RentGrow was "largely unaware of the procedures [TUBDS] uses to collect its data" and did not itself review civil court filings. Id. The court posited "that a reasonabl[e] jury could

arguably find that relying on data acquired by a third party, through unknown procedures," fell short of section 1681e(b)'s requirement to follow reasonable procedures to ensure maximum possible accuracy. Id. Second, the court found that McIntyre had adduced enough evidence to create a genuine issue of material fact as to whether omissions in the tenant-screening report rendered that report inaccurate. See id. at *7-8.

Withal, the court determined that McIntyre had not adduced sufficient evidence of actual damages, thus pretermitting her negligent noncompliance claim. See id. at *11. McIntyre does not challenge that determination.

This left McIntyre's willful noncompliance claim as her only potential avenue for recovery. But the district court determined that although a jury could arguably find that RentGrow failed to follow reasonable procedures to ensure maximum possible accuracy, McIntyre had not adduced sufficient evidence to ground a finding of willfulness. See id. at *11-13. In support, the court observed that there was "no evidence that [RentGrow] was on notice that [TUBDS's] civil court data was inaccurate and then ignored such warnings." Id. at *11. And, moreover, neither extant case law nor a Consumer Financial Protection Bureau (CFPB) publication touted by McIntyre would have "ma[d]e clear that a CRA cannot rely on public court records compiled by a vendor." Id.

Because neither negligent noncompliance nor willful noncompliance could in its view supply a basis for liability, the court entered summary judgment in RentGrow's favor. See id. at *13. This ruling also served to sound the death knell for McIntyre's motion for class certification. See Fed. R. Civ. P. 23(a); Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 36 (1st Cir. 2020). Accordingly, the district court denied class certification and dismissed McIntyre's action. This timely appeal followed.

## II. ANALYSIS

We review a district court's entry of summary judgment de novo. See Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). In conducting that appraisal, we construe the evidence of record in the light most congenial to the non-moving party (here, McIntyre) and draw all reasonable inferences to that party's behoof. See id. We are not wedded to the district court's reasoning but, rather, may affirm on any independent ground made manifest by the record. See id.

A district court may grant summary judgment only if "the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017); see Fed. R. Civ. P. 56(a). Where, as here, the motion is premised on the absence of a genuine issue of material fact, the nonmovant bears the burden

- 11 -

of adducing evidence showing "an issue of fact that is 'more than merely colorable.'" Faiella v. Fed. Nat'l Mortg. Ass'n, 928 F.3d 141, 145 (1st Cir. 2019) (quotations omitted).

### A. **The Willfulness Framework**.

On appeal, McIntyre challenges only the district court's determination that she did not adduce evidence sufficient to show that RentGrow willfully failed to comply with its obligations under section 1681e(b). In Safeco, the Supreme Court clarified that, under the FCRA as under the common law, willfulness encompasses not only intentional or knowing violations but also reckless ones. See 551 U.S. at 57-58. McIntyre does not contend that RentGrow intentionally or knowingly failed to comply with section 1681e(b). Instead, she contends that the summary judgment record, construed in the requisite light, suffices to show recklessness on RentGrow's part.

To define recklessness, the Safeco Court looked to the common law. See id. at 68-69. Recklessness — which usually is measured under an "objective standard" in civil cases — entails disregard for "an unjustifiably high risk of harm that is either known or so obvious that it should be known." Id. at 68 (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)). The "essence of recklessness," the Court stated, is the "high risk," id. at 69, which must be "substantially greater in amount than that which is necessary to make [] conduct negligent," id. (quoting Restatement

(Second) of Torts § 500(g) (1965)). Thus, to prove actionable recklessness, a plaintiff must show that the defendant knew or had reason to know of facts that would lead it to understand that it was running an "'unjustifiably high risk' of violating the statute." Id. at 70.

The Safeco Court applied this general paradigm to a situation in which a defendant claimed compliance with the FCRA based exclusively on interpretation of the relevant statutory provision. The statute sub judice required a consumer to be notified if something in her credit report resulted in "adverse action," including "an increase in any charge for . . . any insurance." 15 U.S.C. § 1681s(k)(1)(B)(i). But the statute was silent on how an "increase" should be measured. Safeco, acting "[on] the rationale that 'increase' presupposes prior dealing, . . . took the definition as excluding initial rate offers for new insurance." Safeco, 551 U.S. at 69. As a result, it made no effort to comply with the notice requirement when dealing with the plaintiff. See id.

The Court rejected Safeco's reading of the statute but acknowledged that Safeco's reading, even though incorrect, "ha[d] a foundation in the statutory text." Id. at 69-70. And up to that point, neither the Court itself nor any court of appeals had addressed the issue. See id. at 70. By the same token, no "authoritative guidance" had yet emerged from the Federal Trade

- 13 -

Commission (FTC).[3]  Id.; see id. at 70 n.19 (rejecting as insufficient an opinion letter from a single FTC staff attorney and noting that the letter "did not canvass the issue" and "explicitly indicated that it was merely 'an informal staff opinion . . . not binding on the Commission'" (alteration in original)).  In these circumstances, the Court determined that Safeco lacked the "benefit of guidance . . . that might have warned it away from the view it took." Id. at 70.  "Given this dearth of guidance and the less-than-pellucid statutory text," the Court concluded, "Safeco's reading was not objectively unreasonable, and so f[e]ll[] well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." Id.

The Supreme Court's reasoning suggests that if a CRA is acting in compliance with a reasonable reading of an ambiguous statute — or, as the Supreme Court carefully put it, a reading that is not "objectively unreasonable" — it cannot have been acting recklessly. See id. at 69 ("[T]here is no need to pinpoint the negligence/recklessness line, for Safeco's reading of the statute,

---

[3] Until 2011, the FTC was the principal regulatory agency charged with enforcement of the FCRA. See 15 U.S.C. § 1681s; see also Fed. Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act 3-4 (July 2011).  On July 21, 2011, the CFPB was given primary regulatory and enforcement authority. See generally Consumer Financial Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010); id. at 2090-92 (codified at 15 U.S.C. § 1681s(e)).

albeit erroneous, was not objectively unreasonable."); id. at 70 ("Safeco's reading was not objectively unreasonable . . . ."). Following that reasoning, "[a] credit reporting agency may act in reckless disregard of a statute's requirements by adopting an objectively unreasonable interpretation of the law." See Cortez, 617 F.3d at 721 (citing Safeco, 551 U.S. at 69).

But compliance need not necessarily turn squarely on a question of statutory interpretation. After all, the statute may be very clear or the reasonableness of a CRA's compliance may depend more on context than on the CRA's reading of the statutory text. RentGrow concedes that section 1681e(b), which requires that a CRA "follow reasonable procedures to assure maximum possible accuracy" of reported information, presents just such a situation, that is, a situation in which compliance does not turn squarely on statutory interpretation but, rather, on the facts. 15 U.S.C. § 1681e(b). In such a case, we must evaluate whether a CRA acted in disregard of facts that would make it obvious, considering the totality of the circumstances, that there was an unjustifiably high risk that it was not complying with the statute. See Cortez, 617 F.3d at 721-22 ("A credit reporting agency may also willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA.").

### B.  **McIntyre's Willful Noncompliance Claim**.

Against this backdrop, we train the lens of our inquiry upon McIntyre's claim that RentGrow recklessly failed to comply with section 1681e(b).  The essence of this inquiry is whether, considering the totality of the circumstances, a jury could find that RentGrow implemented its procedures in disregard of facts that would have made it obvious that it was running an unjustifiably high risk of failing to satisfy its compliance obligations under section 1681e(b).  To reach this question, though, we first consider two antecedent queries.  First, could a jury find that McIntyre's report contained material inaccuracies resulting from the procedures employed by RentGrow?[4]  Second, could a jury find that RentGrow failed to follow reasonable procedures to assure maximum possible accuracy?  We address these queries sequentially, mindful that — if the answer to either is in the negative — RentGrow cannot be liable for willful noncompliance with section 1681e(b).

1. **Accuracy**.  In order to succeed on a section 1681e(b) claim, the plaintiff must show that her credit report contained one or more material inaccuracies.  See DeAndrade v. Trans Union LLC, 523 F.3d 61, 65-66 (1st Cir. 2008).  This demands a showing that the report contained an entry or entries that a jury could

---

[4] Our references, here and elsewhere, to what a jury could find contemplate a reasonable jury, making supportable findings.

- 16 -

find were either false or materially misleading.  See, e.g., Saunders v. Branch Banking & Tr. Co. of Va., 526 F.3d 142, 148 (4th Cir. 2008) ("[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression."); Sepulvado v. CSC Credit Servs., Inc., 158 F.3d 890, 895 (5th Cir. 1998) ("A credit entry may be 'inaccurate' within the meaning of the statute either because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.").

McIntyre's report contained entries with omissions that a jury could find were materially misleading and, thus, inaccurate. A few examples serve to illustrate the point. The entries in the report concerning one of McIntyre's cases (LT-12-01-18-5230) contained no indication that the complaint in the case had been withdrawn. A jury could find that the omission was materially misleading. Without knowing that the complaint was withdrawn, a landlord might well think either that the case was still velivolant or — even worse — that there was an unsatisfied judgment hanging over McIntyre's head. In another case (LT-12-10-05-3884), the satisfaction of the judgment was not reflected in McIntyre's tenant-screening report, notwithstanding that the judgment had been paid in full more than two years before the report was prepared. A jury could find that this omission constituted a

- 17 -

material inaccuracy. After all, the implication that a consumer is saddled with an unsatisfied civil judgment could adversely affect credit decisions.

To cinch the matter, TUBDS (upon inquiry from RentGrow) admitted that the court-records information in the original report was "inaccurate or incomplete" in various respects. Moreover, the updated report that RentGrow prepared deleted several entries and corrected others. TUBDS's admission and RentGrow's revisions bolster the conclusion that a jury could find that the original credit information was inaccurate.

RentGrow suggests that certain of these entries were actually accurate and that because the report, on the whole, correctly reflected that McIntyre had difficulties with prior landlords, the report's omissions cannot be characterized as materially misleading. These suggestions are not without some force, but they are, as the district court determined, see McIntyre, 2021 WL 3661499, at *8-9, grist for a jury's mill.

We need not tarry. The short of it is that the district court did not err in concluding that the question of whether McIntyre's report contained materially inaccurate information was for the jury. See id. Thus, McIntyre has checked the first box necessary for a willful noncompliance claim.

2. **Compliance with Reasonable Procedures**. We next ask whether a jury could find that RentGrow failed to follow reasonable

procedures for assuring the maximum possible accuracy of the information included in its reports. It is undisputed that RentGrow relied on TUBDS's reporting and did not itself review civil court filings, dockets, or other court records. The fact that a CRA relies on a third-party vendor to furnish court-records information does not automatically render its procedures unreasonable as a means of assuring the maximum possible accuracy of the information in its reports. In the context of such a third-party vendor relationship, the question is what the record shows about the reasonableness of the procedures that the CRA implemented to assure the maximum possible accuracy of the vendor-sourced information included in its reports.

Here, a jury could find that RentGrow failed to implement reasonable procedures to assure maximum possible accuracy. Although RentGrow did engage in an ad hoc filtering process, it did not have procedures in place to verify whether the court-records information it received from TUBDS was either correct or complete. Nor did it independently spot-check or otherwise review the underlying dockets.

A jury could evaluate RentGrow's handling of this aspect of its business in light of facts sufficient to support an inference that RentGrow knew or should have known that TUBDS's data was not presumptively reliable. For one thing, RentGrow's reliance on TUBDS for court-records information resulted in a not-

insignificant number of disputes over a two-year period (from October of 2016 through October of 2018):  6,194 disputes out of 272,893 tenant-screening reports containing court-records information.  This means that roughly 2.3 percent of the reports were disputed — and many of those disputes appear to have been successful in securing corrections.  Of 2,953 disputes containing eviction-litigation records (a subset of court-records information), 2,526 resulted in corrections of some sort.

For another thing, industry trends suggested that TUBDS's court-records information might not be presumptively reliable.  Following a 2015 settlement with over thirty state Attorneys General that required TransUnion (TUBDS's parent company) and other large CRAs to adhere to stipulated accuracy standards for the reporting of certain information, TransUnion for the most part stopped reporting civil court judgments in credit reports to end-users.  See Consumer Fin. Prot. Bur., Quarterly Consumer Credit Trends: Public Records, at 3-4 (February 2018) ("The most significant changes were observed for civil judgments. They had been the most common public record prior to July 2017, but after the [program required by the settlement] they disappeared entirely."); see also Settlement Agreement, In re Investigation by Eric T. Schneiderman, Attorney General of the State of New York, of Experian Information Solutions, Inc., et al. (March 8, 2015). But TransUnion continued to make this information available,

through TUBDS, to intermediary CRAs like RentGrow. Here, moreover, the record (including the testimony of RentGrow's corporate representative) indicates that RentGrow continued to purchase civil court records from TUBDS while remaining largely unaware of both the processes by which TUBDS collected those records and the procedures that TUBDS used to update records and verify their accuracy.

Notwithstanding this chiaroscuro background, the record does not suggest that RentGrow was indifferent to the accuracy of its reported information. Importantly, RentGrow took care to select the court-records provider that it deemed best. Over the course of several years, RentGrow had received business solicitations from other court-records vendors, thoroughly considered their offerings, and tested samples of their proffered data against the data that TUBDS was supplying. In these comparisons, TUBDS's data appeared to be the most reliable and complete. These comparisons led RentGrow to deem TUBDS the "gold standard" for the industry and to continue using TUBDS as its court-records vendor. In addition, RentGrow's filtering process culled a substantial portion — nearly a quarter — of the court records from TUBDS to ensure that it was not including mismatched or unreportable information in tenant-screening reports. And, finally, the record — at least with respect to McIntyre — indicates

that RentGrow promptly responded to disputes and made corrections as warranted.[5]

In sum, the evidence as to the reasonableness of RentGrow's procedures to assure maximum possible accuracy was conflicting and, thus, presented a question of fact for the jury.[6] See McIntyre, 2021 WL 3661499, at *8. It follows that McIntyre has checked the second box needed for prosecution of her willful noncompliance claim.

**3. Recklessness**. Although a jury could find that McIntyre's report contained material inaccuracies and that RentGrow failed to follow reasonable procedures to assure maximum possible accuracy, a willful noncompliance claim requires more: a showing that a CRA's failure to comply was knowing or reckless. See Safeco, 551 U.S. at 57. McIntyre does not assert that RentGrow intentionally or knowingly violated section 1681e(b), so her claim stands or falls on whether she can show that RentGrow acted

_____

[5] Although the record indicates that RentGrow routinely made corrections with respect to other consumers, the record is tenebrous with respect to the average timeline on which corrections were made in response to other consumer disputes.

[6] RentGrow suggests that the district court should not have reached the issue of reasonableness because McIntyre did not introduce evidence of "unreasonable procedures." Considering that McIntyre's claim was that RentGrow's lack of procedures and its lack of knowledge about its vendor's procedures could be regarded as unreasonable, this suggestion gains RentGrow no ground. If chased to its tail, the logic of this suggestion would effectively allow CRAs to insulate themselves from section 1681e(b) willful noncompliance claims by relying blindly on third parties for information.

recklessly. Surviving summary judgment on recklessness requires the record to show sufficient facts to make it obvious to a CRA that, under the totality of the circumstances, there was an unjustifiably high risk that the CRA was not following reasonable procedures to assure maximum possible accuracy.

In the case at hand, McIntyre argues that guidance from an edition of the CFPB's <u>Supervisory Highlights</u> publication should have given RentGrow clear notice that its procedures were unreasonable and thus that it was not fulfilling its compliance obligations.[7] RentGrow tries to ground this argument before it takes flight. It contends that the argument was not raised below and, therefore, cannot take wing on appeal. <u>See</u> <u>Teamsters Union,</u> <u>Local No. 59</u> v. <u>Superline Transp. Co.</u>, 953 F.2d 17, 21 (1st Cir. 1992); <u>see</u> <u>also</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990). RentGrow, however, reads the record too myopically. McIntyre quoted the purportedly relevant guidance in her complaint

---

[7] McIntyre argued below that other data points could have given RentGrow notice that there was a high risk that it was violating section 1681e(b). These data points included RentGrow's dispute rate (approximately 2.3 percent), the nature of its business arrangements with TUBDS, and certain decisions of federal courts of appeals. In this venue, though, McIntyre does not develop any arguments as to how these data points might be assessed by a jury in the course of a totality-of-the-circumstances analysis. Consequently, we treat these points as waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) (stating that it is "not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").

and both quoted and discussed it in her opposition to RentGrow's motion for summary judgment. No more was exigible to preserve the argument for appeal.

Turning to the merits of McIntyre's argument, we do not gainsay that there was sufficient evidence for McIntyre to take the question of whether RentGrow's procedures were reasonable to the jury. See supra Part II(A). But the Supervisory Highlights publication does not clearly warn RentGrow off the use of the procedures that it had in place.

RentGrow attempts to end this discussion before it begins. In this regard, RentGrow asserts that Safeco requires us to find that the Supervisory Highlights publication cannot, as a matter of law, provide notice to RentGrow as to whether its conduct violates section 1681e(b). This is so, RentGrow submits, because Safeco requires that a publication be "authoritative guidance" in order to provide clear notice.

The Safeco Court used the term "authoritative guidance" in discussing what might inform the interpretation of an ambiguous statutory term, but it is not readily apparent what the Court meant by that usage. Here, however, we need not delve too deeply into the meaning and application of the "authoritative guidance" rubric because the Supervisory Highlights language embraced by McIntyre simply does not give the clear notice that she attempts to read

into it.  Its utility is eroded by its sparse detail and the fact-specific nature of the examination actions it recounts.

Some context is helpful.  The CFPB is the principal enforcer of the FCRA, see supra note 3; see also 15 U.S.C. § 1681s(e), and since 2012 it has published Supervisory Highlights — summaries of examination results, supervision actions, and enforcement actions — to let compliance professionals in the industry know how the CFPB applies the law.  See Consumer Fin. Prot. Bur., Supervisory Highlights: Fall 2012, at 2 (2012).  The CFPB has cautioned, however, that Supervisory Highlights gives only a pinhole view of the "requirements of relevant laws and regulations" through summaries of the agency's actions in fact-specific settings and "does not impose any new or different legal requirements."  Consumer Fin. Prot. Bur., Supervisory Highlights: Summer 2018, at 2 (2018); see id. ("[T]he legal violations described in this and previous issues of Supervisory Highlight are based on the facts and circumstances reviewed by the [CFPB] as part of its examinations.  A conclusion that a legal violation exists on the facts and circumstances described here may not lead to such a finding under different facts and circumstances.").

McIntyre asks us to accord decretory significance to the Summer 2015 edition of Supervisory Highlights, which discussed the CFPB's examination and supervision actions against certain CRAs that relied on third-party furnishers of public records.  See

Consumer Fin. Prot. Bur., Supervisory Highlights: Summer 2015, at 6 (2015). Citing "weaknesses" including "hav[ing] never conducted a formal audit of their public record providers" and "not hav[ing] defined processes to verify the accuracy of public record information provided by their public records providers," the CFPB "directed one or more CRAs to establish and implement suitable and effective oversight of public records providers." Id. It also reported that the agency had initiated supervisory action against CRAs when, even though "processes existed to analyze and improve the quality of incoming data, there was no post-compilation report review or sampling to test the accuracy of consumer reports." Id. The publication suggests that compliance procedures should include processes to audit and verify public-records information and to supervise third-party public-records vendors.

McIntyre submits that these comments should have put RentGrow on clear notice that its procedures were unreasonable and, thus, that in maintaining them, it was undershooting its compliance obligations under section 1681e(b). We do not agree. The "weaknesses" identified in the Supervisory Highlights publication touted by McIntyre were just that — weaknesses — and not clear indications that any single deficiency would render a CRA's procedures, as a whole, unreasonable. And in all events, the spare and cryptic four paragraphs upon which McIntyre leans do little more than restate factors that the CFPB considers in

assessing compliance.[8] They do not add much more than common sense would add in considering what might be reasonable steps to take toward assuring the accuracy of data acquired from vendors. Indeed, other sections of the same Supervisory Highlights edition contain vastly more substance and detail about industry practices and appropriate compliance procedures.

Seen in this light, no reasonable jury could find that the publication relied on by McIntyre was sufficient to put RentGrow on clear notice that its battery of procedures to assure accuracy — selecting the best-available records provider, reassessing that choice in comparisons with competitors, filtering out roughly a quarter of returned results to remove mismatches and unreportable information, and responding promptly to disputes — was inadequate under the circumstances to satisfy its compliance obligations. Accordingly, we conclude that McIntyre has not adduced, by means of the Supervisory Highlights publication on which she stakes her case on appeal, sufficient evidence to show that RentGrow was acting recklessly. Put another way, no

---

[8] In assessing whether procedures for ensuring accuracy are reasonable under section 1681e(b), the CFPB has said that it will consider "all relevant factors" set forth in a non-exhaustive list. Consumer Fin. Prot. Bur., CFPB Supervision and Examination Manual, at Procedures 10 (Version 2, October 2012). Those factors include the "[s]creening of furnishers," "[f]orm and manner in which information is reported," "[s]creening and matching of information from furnishers," "[m]easures to prevent duplicative tradelines on reports," and "[o]ther measures to test accuracy." Id.

reasonable jury could conclude, based on that publication, that RentGrow was disregarding an unjustifiably high risk, of which it knew or had reason to know, that it was failing to follow reasonable procedures to assure maximum possible accuracy of the information contained in its tenant-screening reports.

**III. CONCLUSION**

We need go no further. In order to thwart the swing of the summary judgment axe, a plaintiff must adduce competent evidence sufficient to prove each and every element of her claim. See Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007). McIntyre has failed to carry this burden with respect to proof of recklessness. And because McIntyre premised her willful noncompliance claim solely on recklessness, RentGrow was entitled to summary judgment on that claim. The district court, therefore, did not err either in granting RentGrow's Rule 56(a) motion or in denying McIntyre's motion for class certification.

**Affirmed**.

**— Concurring Opinion Follows —**

**LYNCH**, **Circuit Judge, concurring in the judgment**. I read Safeco Insurance Co. of America v. Burr, 551 U.S. 47 (2007), differently in several respects. I prefer to follow Chief Justice Roberts's statement in PDK Laboratories Inc. v. United States Drug Enforcement Administration: "[I]f it is not necessary to decide more, it is necessary not to decide more." 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring).

The dispositive question in this appeal is whether McIntyre has asserted sufficient evidence to permit a jury to conclude that RentGrow's purported violation of the Fair Credit Reporting Act ("FCRA") was willful. See 15 U.S.C. § 1681e(b). I would not address other issues. Safeco holds that in the absence of actual knowledge of a violation of the statute, willfulness may be shown by demonstrating recklessness. 551 U.S. at 57-59. Safeco focuses on the test under the recklessness standard of whether RentGrow's procedures were "objectively unreasonable." Id. at 69-70. Here, RentGrow's procedures were plainly not "objectively unreasonable."[9] That should end the matter.

Safeco states that "there is no need to pinpoint the negligence/recklessness line, for Safeco's reading of the statute, albeit erroneous, was not objectively unreasonable." 551 U.S. at

---

[9] RentGrow selected the best-available records provider, reassessed that choice in comparisons with competitors, filtered out those results to remove mismatches and unreportable information, and responded promptly to disputes.

69. Safeco gives no guidance as to relative risk assessment. Thus, I think we should go no further than the Supreme Court was willing to venture.

In my view, as well, the "objectively unreasonable" test applies whether the asserted violation is one of pure statutory interpretation or one of application of the statutory standards to particular facts. After all, in the FCRA, Congress referred to the "reasonable[ness]" of the procedures used. See 15 U.S.C. § 1681e(b) ("Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information . . . ." (emphasis added)).

Safeco, in its analysis of the "objectively unreasonable" test, states that "no authoritative guidance ha[d] yet come from the FTC" and "no court of appeals had spoken on the issue," Safeco, 551 U.S. at 70 (emphasis added). I would approach the analysis of McIntyre's reliance on the Consumer Financial Protection Bureau ("CFPB") Supervisory Highlights differently than the majority. In my view, the question of what constitutes "authoritative guidance" is not the same question as the adequacy of notice. The words "authoritative" and "notice" are different words and have different meanings. The Oxford English Dictionary first defines "authoritative" as "[i]ssued by a person or group in authority; proceeding from an official source and requiring

compliance or obedience." Authoritative, OED Online (Mar. 2022), https://www.oed.com/view/Entry/13346?redirectedFrom=authoritativ e (last visited May 4, 2022). One circuit court has held that CFPB "authoritative guidance" cannot be "authoritative" until after it has gone through the Administrative Procedure Act's notice-and-comment rulemaking or an administrative adjudication. See Van Straaten v. Shell Oil Prods. Co. LLC, 678 F.3d 486, 488 (7th Cir. 2012) (holding that FTC bulletin "not only lacks a definition but also has no authoritative effect; it is neither an exercise in notice-and-comment rulemaking nor the outcome of administrative adjudication."). We need not resolve that question here.

Here, we know that the Supervisory Highlights is not "authoritative guidance" because the CFPB itself states that the Supervisory Highlights is not authoritative or binding. The Supervisory Highlights states that the document "does not impose any new or different legal requirements." Consumer Fin. Prot. Bureau, Supervisory Highlights: Summer 2018, at 2 (2018). And when the CFPB did publish a regulation through notice-and-comment rulemaking on the "Role of Supervisory Guidance" in February 2021, it stated that "supervisory guidance does not have the force and effect of law. As such, supervisory guidance does not create binding legal obligations for the public." Role of Supervisory

- 31 -

Guidance, 86 Fed. Reg. 9261, 9261 (Feb. 12, 2021) (to be codified at 12 C.F.R. pt. 1074).

For the above stated reasons, I concur in the judgment.